**UNDERWRITERS AT LLOYD'S, LONDON, Trident Insurance Company, Limited; the Phoenix Greek General Insurance Company S.A.; Sphere Insurance Company Limited; Assicurazioni General SPA; Polaris Norske SJO Insurance Company Limited; Fenton Insurance Company Limited per Marlow Underwriting Agency, Appellants,**

v.

**UNITED BANK ALASKA, an Alaskan Banking Corporation, Appellee.**

No. 5402.

Supreme Court of Alaska.

Nov. 27, 1981.

Lloyd B. Ericsson, Robert J. Ericsson, Martin, Bischoff, Templeton, Biggs & Ericsson, Portland, Or., Rand Dawson, Anchorage, for appellants.

Kenneth R. Lamb, Kenneth R. Lamb & Associates and Walter H. Garretson, Garretson & Jarvi, Anchorage, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

MATTHEWS, Justice.

On August 13, 1978, an airplane piloted by Ted Koerber and owned by Richard Burnette was totally destroyed in a crash. The aircraft had been purchased by Burnette in

1977 from Lynwood Marshall.[1]  Apparently, the aircraft was regularly kept at the same airfield where Marshall's business was located.  Effective March 8, 1978, the appellant insurance companies [Underwriters] issued a policy of hull insurance under which Marshall was the named insured and under which various aircraft, several of which were not owned by Marshall, were specifically described, including that owned by Burnette.  Appellee United Bank of Alaska was listed as the lienholder of Burnette's aircraft.

Just what the agreement between Burnette and Marshall was as of March 8, 1978, is not reflected by the record.  However, it is clear that Burnette orally leased the plane to Marshall at some point so that Marshall could use it on a Bureau of Land Management contract which began on May 3, 1978, and terminated on August 10, 1978.  Marshall stated by affidavit that on August 10, 1978, he informed Burnette that the BLM contract had been completed and that the oral lease for the aircraft was terminated.  Effective that same day, Marshall deleted the aircraft from the reporting form, required by the insurance policy, on which he was to list those planes owned or leased by him.  Marshall also averred that on August 10, Burnette came to his place of business with Ted Koerber and asked Marshall if Koerber had been checked out in the aircraft in question.  Marshall told Burnette that Koerber had not been checked out in the aircraft and that he had no personnel available to do so at the time.  Subsequently on the same day, Koerber arrived at the airport with another pilot who apparently did conduct a test flight of the aircraft with Mr. Koerber.  On August 13, Koerber came to the airport alone, purchased gas from Marshall for the aircraft, and informed Marshall's employee that either he or Burnette would pay for the gas upon his return.  This was the flight that terminated in the crash which gave rise to this lawsuit.

1.  Lynwood Marshall owns Alaska Air Service, Inc., Alaska Aero Service, Inc., and Alaska Floatplane Service, Inc.  Individual reference to Marshall's companies has been omitted for the sake of brevity.

Following the crash, United Bank sued Burnette to collect on a promissory note which Burnette had signed in order to purchase the aircraft. As security for the note, United Bank had a security interest in the aircraft. United Bank also sued Underwriters for 80% of the insured value of the aircraft under the hull insurance policy between Marshall and Underwriters. United Bank moved for summary judgment against Underwriters, and the motion was granted over opposition. From the judgment which followed, Underwriters have appealed.

The relevant policy clauses are as follows:

COVERAGE A—FLIGHT, TAXIING, ON THE GROUND OR MOORED.

[Underwriters agree] . . .

to pay for direct physical loss of or damage to the aircraft including disappearance if the aircraft is unreported for 60 days after the commencement of the flight. . . .

1. AIRCRAFT COVERED

The insurance afforded under this policy shall apply to all standard licensed Fixed Wing Land aircraft owned by the Insured or operated by the Insured under a lease or other agreement at the inception date of this Policy and shall automatically apply to any additional standard licensed aircraft . . . acquired by the Insured as owner, lessee or rentee during the Policy period, effective as of the time and date the Insured acquires possession of such additional aircraft.

4. REPORTS

The Insured agrees to keep accurate records pertaining to all aircraft insured under this Policy and to report monthly the following information with respect to each aircraft insured under this Policy during the preceding month: Make and type of aircraft, F.A.A. registration number, insured value as defined in paragraph 2 of this Endorsement, and the number of days the Underwriters have been at risk with respect to each such aircraft. The Underwriters shall not be liable for any claims with respect to any aircraft which has not been reported

from the date the Insured acquired such aircraft as owner, lessee or rentee as provided above. The Underwriters shall be permitted to examine this Insured's records at any reasonable time during the Policy Period and any extension thereof, and within one year after its final expiration insofar as they relate to the determination of the premiums for this Policy. It is a condition of this Policy that no payment of any claim hereunder shall be made until all reports due to the date that the claim arose have been furnished the Underwriters and the premium earned as a result of such reports paid.

Attached to the policy was an endorsement entitled "Breach of Warranty Endorsement" which identified the aircraft in question as subject to the lien of the United Bank of Alaska. The endorsement provided in relevant part:

In consideration of an additional premium of $ *Included*

IT IS UNDERSTOOD AND AGREED THAT:

1. The insurance afforded by the Policy shall not be invalidated as regards the interest of the Lienholder by any act or neglect of the Insured except that any change in title or ownership of the aircraft, conversion, embezzlement or secretion by the Insured in possession of the aircraft are not covered hereunder; PROVIDED HOWEVER THAT:

A. If the Insured fails, on demand of the Underwriters to pay any premium due under this policy, the Lienholder shall pay such premium; and

B. The Lienholder shall notify the Underwriters of any increase of hazard which comes to the Lienholder's attention and if not permitted by the policy, it shall be endorsed thereon, the Lienholder agreeing to pay any additional required premium if the Insured shall fail to do so on demand of the Underwriters.

It is, however, further understood and agreed by the parties concerned that the protection afforded to the Lienholder by the terms of this endorsement is limited

to the perils covered under the policy and for which a specific premium charge has been made.

2. If the Insured fails to render proof of loss within the time granted in the policy conditions, the Lienholder shall do so within 60 days thereafter, in form and manner as provided by the policy and further shall be subject to the provisions of the policy relating to appraisal and time of payment and of bringing suit.

3. Whenever the Underwriters shall be liable to the Lienholder for any sum for loss or damage under this policy and shall claim that as to the insured, no liability therefor existed, their liability under the terms of this endorsement shall not in any event exceed the amount of the lien set forth above, less the amount of all matured instalments and less unearned interest or carrying charges and unearned financed insurance premium, if any.

4. The Underwriters reserve the right to cancel this policy at any time as provided by its terms but in such case notification shall be given the Lienholder when not less than [30] days hereafter such cancellation shall be effective as to the interest of said Lienholder therein and the Underwriters shall have the right, on like notice, to cancel this endorsement.

5. Upon payment of any sum to the Lienholder as provided hereafter, the Underwriters shall to the extent of such payment be thereupon legally subrogated to all the rights of the Lienholder under all securities held as collateral to the debt and the Lienholder shall assign and transfer to the Underwriters all instruments of security pertaining to the aircraft; but no subrogation shall impair the right of the Lienholder to recover the full amount of his claim.

The Underwriters argue that under the aircraft-covered clause quoted above, the insurance afforded was limited to those aircraft which were owned or operated by the insured at the time of the accident. Since as of the time of the crash, August 13, 1978, Burnette's aircraft was not operated by the insured, Marshall, under a lease or other agreement they contend there is no coverage.

We do not find this argument persuasive. The aircraft covered clause speaks only to the inception of coverage, not to its cessation. The clause provides that coverage will begin for any aircraft which is owned or operated by the insured either at the inception date of the policy or thereafter during the policy term. It does not tell us when coverage ends. To determine that, one must refer to the other clauses of the policy.

With respect to United Bank, it is clear that none of the other clauses of the policy apply to defeat coverage in this case. United Bank was the listed lienholder in the Breach of Warranty Endorsement covering the aircraft. That clause contains three relevant provisions. First, the acts or neglect of the insured, Lynwood Marshall, could not invalidate United Bank's lienhold interest. Second, United Bank was obligated to pay any premiums which Lynwood Marshall failed to pay. Finally, the bank was entitled to 30 days notice before coverage could be cancelled.

The Breach of Warranty Endorsement constitutes a separate contract between United Bank and the Underwriters.[2] The fact that Marshall terminated the lease and did not report the aircraft as a covered plane after August 10, 1978 does not impair United Bank's right to recover. The Breach of Warranty clause specifically protects the Bank against "acts" of the insured, including unilateral cancellation, absent effective notice.[3]

**2.** 5A J. Appleman, *Insurance Law and Practice,* § 3401 at 282–88 (1970); 11 A. Couch, *Cyclopedia of Insurance Law* § 42:694 at 348–50 (2d ed. 1963); *White Motor Corp. v. Northland Ins. Co.,* 315 F.Supp. 689, 691–92 (D.S.D.1970); *American Merc. Ins. Co. v. Inland W. Finance Co.,* 6 Ariz.App. 409, 433 P.2d 60, 62 (1967);

*Fred v. Pac. Indemnity Co.,* 53 Haw. 384, 494 P.2d 783, 787 (1972); *Reserve Ins. Co. v. Aguilera,* 181 Neb. 605, 150 N.W.2d 114, 117 (1967).

**3.** *Tarleton v. De Veuve,* 113 F.2d 290 (9th Cir. 1940), *cert. denied,* 312 U.S. 691, 61 S.Ct. 710, 85 L.Ed. 1127 (1941); *Employers' Fire Ins. Co.*

For these reasons, the judgment is AFFIRMED.

---

*v. Penn. Millers Mut. Ins. Co.,* 116 Ga.App. 433, 157 S.E.2d 807 (1967); *Gilman v. Commonwealth Ins. Co.,* 112 Me. 528, 92 A. 721 (1914).