**AMERICAN NATIONAL BANK AND TRUST COMPANY, Respondent,**

v.

**Terry Robert YOUNG, Defendant,**

**Avemco Insurance Company, Appellant.**

**No. C9–82–258.**

Supreme Court of Minnesota.

Feb. 4, 1983.

Wolk & Jacob and Arthur Alan Wolk, Philadelphia, Pa., Dean K. Johnson, Bloomington, for appellant.

Geraghty, O'Loughlin & Kenney, Terence O'Loughlin and Richard J. Thomas, St. Paul, for respondent.

TODD, Justice.

An individual claiming to be Terry Robert Young borrowed $225,000 from the American National Bank to purchase an airplane. Avemco Insurance Company furnished insurance coverage on the airplane, including a "Breach of Warranty Endorsement." The airplane was flown to Colombia where it was seized by the Colombian government. American National Bank, relying upon a deposition of Young in which he denied owning or financing the airplane, recovered $196,924.31 under a blanket bond. American subsequently sued Avemco seeking recovery of $221,924.31, the balance due on the note. American agreed that it would reimburse that portion of its recovery which the insurance company had paid under the bond. The trial court allowed recovery against Avemco for the full amount claimed, plus prejudgment interest. We affirm.

The facts are found in a written stipulation of the parties, together with exhibits received in evidence. The stipulation exclusive of attached exhibits provides:

1. Plaintiff American National Bank and Trust Company is a national banking association organized and existing under the general banking laws of the United States, its principal place of business being in the City of Saint Paul, Minnesota. Defendant Terry Robert Young is a resident of Raleigh, North Carolina. Defendant Avemco Insurance Company is a Maryland corporation duly licensed and registered with the Minnesota Commissioner of Insurance to do business in the State of Minnesota.

2. On or about October 1, 1978, a person identified as Terry Robert Young, made formal application with plaintiff in Minnesota for a loan in the amount of $225,000.00 to purchase a 1977 Cessna 404 Tital Ambassador II airplane having FAA Registration No. 37125 and Aircraft Serial No. 404–0113. As a condition of the loan, plaintiff required Young to obtain an aircraft insurance policy, including a so-called Breach of Warranty Endorsement.

3. On October 2, 1978, the involved aircraft was sold by Sky Sales and Service, Inc., Oklahoma City, Oklahoma, to Terry Robert Young of Raleigh, North Carolina, a copy of the Bill of Sale being attached as Exhibit "A".

4. On or about October 4, 1978, Avemco forwarded to plaintiff its Telex Binder of coverage on the aircraft in the amount of $280,000.00, effective October 3, 1978, with a "Breach of Warranty in your favor", a copy of which Telex Binder is attached as Exhibit "B". On or about October 4, 1978, Avemco issued to plaintiff its Aircraft Insurance Temporary Binder No. 23759A, affording insurance coverage for the period from October 3, 1978 to October 19, 1978, a copy of which is attached as Exhibit "C".

5. On October 4, 1978, plaintiff loaned to Young, for the purchase of the aircraft, the sum of $225,000.00 to be repaid in monthly installments over a period of six years, with interest at 3% per annum over plaintiff's prime loan rate for short term borrowing, which rate would fluctuate with plaintiff's prime rate. A copy of the Promissory Note dated October 4, 1978 is attached as Exhibit "D". To secure the loan, plaintiff obtained and duly perfected a security interest in the aircraft, a copy of the Security Agreement being attached hereto as Exhibit "E".

6. On October 11, 1978, the aircraft was seized in Baranquilla Province, Colombia (which is south of the 16 degree North latitude) pursuant to Decision No. 0675 of 1978 of the Governor, Department of Atlantico, Republic of Colombia. A copy of the official U.S. Department of State's translation of said Decision is attached as Exhibit "F".

7. In early November 1978, Avemco received an Application for insurance purporting to have been signed on October 30, 1978 by Terry Robert Young, a copy being attached as Exhibit "G".

8. On November 2, 1978, and on November 9, 1978, respectively, Avemco issued to plaintiff its confirmations of insurance coverage effective October 4, 1978, copies of which are attached as Exhibit "H". On or about November 15, 1978, Avemco sent to plaintiff its aircraft policy AVI–139460–0 for the policy period October 4, 1978 to October 4, 1979, a copy of which is attached as Exhibit "I".

9. The policy of insurance issued by the defendant Avemco Insurance Company contained a Breach of Warranty Endorsement for which Avemco charged an additional premium of $50.00.

10. On November 10, 1978, the first payment to the bank by Terry Robert Young was due. After it ran a few days past due, plaintiff's Vice-President, Frank L. Wimer, contacted Terry Robert Young by telephone and was told that the loan papers had been sent to Young by telephone and was told that the loan papers had been sent to Young in blank. Mr. Wimer knew at the time of his telephone call to Young that the loan papers had been filled in when sent to Young. The November 10, 1978 payment of $6,143.55 was paid on November 24, 1978,

leaving principal due of $221,924.31. The substance of Wimer's November telephone conversation with Young was not made known at that time to Avemco.

11. The payment due December 10, 1978 to the bank from Terry Robert Young was never made.

12. Sometime prior to January 8, 1979, Mr. Wimer learned that the aircraft had been confiscated in Colombia. On January 8, 1979, Wimer contacted Young by telephone at his business and advised that the bank was aware that the aircraft was confiscated in Colombia.

13. On January 10, 1979, Mr. Wimer prepared a Memorandum indicating that plaintiff had recently learned the following concerning Young:

a. Terry Robert Young had an aircraft financed with the American National Bank, Morristown, New Jersey, which had instituted suit against Mr. Young for fraud in the financial statement, secretion of property, and delinquency on his loan. The aircraft involved was a 1968 Aero Commander twin engine aircraft;

b. The General Electric Credit Company extended sums of money to Terry Robert Young for the purchase of an Aero Commander twin engine aircraft and that aircraft had been seized and was detained in Bogata, Colombia;

c. Cessna Finance Corporation had extended credit to Terry Robert Young for a Cessna Turbo 210 single engine aircraft with no information as to whether or not the first payment had been made;

d. Commercial Credit Equipment Corporation had extended loans to Terry Robert Young for a 1977 Cessna 337 twin engine aircraft and the aircraft was subsequently repossessed.

A copy of the Memorandum is attached as Exhibit "J".

14. On March 28, 1979, plaintiff first notified Avemco of the loss of the aircraft. A copy of plaintiff's letter is attached as Exhibit "K".

15. Plaintiff collected $196,924.31 under a Banker's Blanket Bond in connection with its losses arising out of the transaction with Terry Robert Young, a copy of which bond is attached as Exhibit "L".

16. The aircraft, at the time of its loss had a reasonable value of $235,000.00.

The breach of warranty agreement referred to in the stipulated facts provides in part.

Loss, if any, under Coverage C shall be payable as interest may appear to the lienholder named in Item 8 of the declarations and this insurance as to the interest of the bailment lessor, conditional vendee or mortgagee or assignee of bailment lessor, conditional vendor or mortgagee (herein called the lienholder) shall not be invalidated by any act or neglect of the lessee, mortgagor or owner of the within described aircraft * * *

Nothing herein contained shall be held to vary, waive, alter or extend any of the terms, conditions, agreements, or warranties of the below mentioned policy, other than as above stated. * * *

Under the exclusion portion of the policy, coverage is not provided "during or in connection with a flight involving any trafficking in narcotics, drugs, or hallucinogenics or involving the unlawful importation or exportation of property or persons" or accidents or losses "due to (2) capture, seizure, arrest, restraint, or detention or the consequences thereof or any attempt thereat or any taking of the aircraft or any loss or damage thereof by any Government or governmental authority or agent (whether secret or otherwise) or by any military, naval, or usurped power, whether any of the foregoing be done by way of requisition or otherwise and whether in time of peace or war and whether lawful or unlawful * * *.

Article VIII of the Insurance Agreement's portion of the policy provides in part:

VIII. Policy Period, Territory. This policy applies only to occurrences, accidents and losses which happen during the policy period while the aircraft is within

the Western Hemisphere north of 16° North Latitude (excluding Cuba) * * *.

Based on the stipulated facts and the exhibits in the record the trial court made its findings of fact and reached the following Conclusions of Law:

1. That the loss of the airplane was the result of Young's act or neglect.

2. That Plaintiff had an insurable interest in the airplane.

3. That Plaintiff's interest in the airplane was insured by the Defendant.

4. That the loss of the airplane was covered by Defendant's policy of insurance with Plaintiff.

Judgment was entered for plaintiff in the amount of $221,924.31 with interest from April 1, 1979. Avemco appeals.

The issues on appeal are:

1. Does the evidence support the finding of the trial court that the defendant Terry Robert Young is the person who obtained the loan and insurance involved in this case?

2. Is the "Breach of Warranty Endorsement" a separate policy of insurance?

3. Do the applicable exclusions of the policy preclude recovery under the Breach of Warranty Endorsement?

4. Does the territorial limits of the insuring Agreement portion of the policy preclude recovery under the Breach of Warranty Endorsement?

■ 1. Avemco, relying upon Young's denial of any connection with the airplane and loan, challenges the correctness of the trial court's determination that Young purchased the airplane, borrowed the money from American, procured the insurance from Avemco, and that his actions caused the airplane to be seized by the Colombian government. The test for factual findings is whether they are clearly erroneous. Minn.R.Civ.P. 52.01. An examination of the record discloses not only that the findings are not clearly erroneous, but rather, they are totally supported and are the only logical conclusion based upon the evidence.

There arises a collateral issue caused by Young's deposition testimony which has become a non-issue. Upon completion of the deposition, the matter was referred to an attorney, not connected with this litigation, who handled blanket bond claims for the bank. A submission was made to the bond carrier, which for reasons not disclosed in this record, allowed the claim. Subsequently, the attorney handling this litigation determined that Young was lying. This is the identical conclusion reached by the trial court and this court. Since the bank has agreed to reimburse the bond carrier out of the proceeds of this litigation, the issues of double recovery or subrogation rights are no longer viable.

2. The trial court found the Breach of Warranty Endorsement to be a "standard mortgage clause." It stated that:

Clauses of this type are distinct from other loss payable clauses because they contain a phrase stating that the insurer's obligation to pay the mortgagee "shall not be invalidated by any act or neglect of the mortgagor." * * * Under a standard mortgage clause like Avemco's breach of warranty endorsement there is a separate agreement between the insurer and mortgagee, here Avemco and American. The rights of the mortgagee are not affected by any act or neglect of the mortgagor and any breach of the policy terms or conditions is no defense to an action brought by the mortgagee.

The court concluded that this statement of the law was in accord with the case law in Minnesota, citing *Allen v. St. Paul Fire and Marine Insurance Co.,* 167 Minn. 146, 149, 208 N.W. 816, 817 (1926) and *Magoun v. Fireman's Fund Insurance Co.,* 86 Minn. 486, 490, 91 N.W. 5, 7 (1902).

There are generally two types of insurance clauses between an insurer and a mortgagee. In the first form, known as "the union, standard, or New York forms, the mortgagee may become liuable to pay the premium to the insurer—in return, it is free from policy defenses which the company may have against the mortgagor." 5A J. Appleman, *Insurance Law and Practice* § 3401, at 282 (1970 & Supp.1981).

The second type is known as the open form mortgage clause. Under the "open form, the mortgagee stands in the mortgagor's shoes and is usually considered subject to the same defenses." *Id.* Here, "the indemnity of the mortgagee is subject to the risk of every act and neglect of the mortgagor which would avoid the original policy in the mortgagor's hands. The rights of the mortgagee in that type of contract are purely derivative, and if the mortgagor would have no right to recover, neither would the mortgagee." *Id.* at 293.

In contrast, "under a standard mortgage clause, the result has been that the courts have held that the agreement of the company with the mortgagee being separate and devisable from that with the mortgagor, the mortgagee cannot be affected by any act or default of the mortgagor, and any breach of the policy terms and conditions committed by the mortgagor is no defense to an action by the mortgagee." *Id.* at 289.

Thus, the initial question is: What type of mortgage clause is this court presented with? The trial court found it to be a standard or union mortgage clause. Avemco conceded it was a standard clause at trial, but subject to the conditions and exclusions in the policy. Avemco is in essence arguing that this is an open mortgage clause and that American's position is derivative rather than independent of Young's.

Under Minnesota case law, this is a standard mortgage clause.[1] The distinction was illustrated in *Allen v. St. Paul Fire and Marine Insurance Co.,* 167 Minn. 146, 149, 208 N.W. 816, 817 (1926), when it stated:

When a policy contains a clause making the loss payable to the mortgagee as his interest may appear, sometimes called an open mortgage clause, the mortgagee is a sort of conditional appointee to receive what would otherwise come to the mortgagor, and if the mortgagor forfeit his right to insurance the loss payable clause is of no avail to the mortgagee; but under the union mortgage clause, the mortgagee has an independent contract with the insurer which is not affected by the future conduct of the insuring mortgagor.

The *Allen* court quoted Circuit Judge Sanborn as to the effect of a standard or union clause:

Our conclusion is that the effect of the union mortgage clause, when attached to a policy of insurance running to the mortgagor, is to make a new and separate contract between the mortgagee and the insurance company, and to effect a separate insurance of the interest of the mortgagee, dependent for its validity solely upon the course of action of the insurance company and the mortgagee, and *unaffected by any act or neglect of the mortgagor, of which the mortgagee is ignorant, whether such act or neglect was done or permitted prior or subsequent to the issue of the mortgage clause.* (emphasis supplied).

*Id.* at 150, 208 N.W. at 818 (citing *Syndicate Insurance Co. v. Bohn,* 65 F. 165, 178 (8th Cir.1894)). The *Allen* court concluded that "the two contracts combined in the policy and the mortgage clause are separable and independent from the beginning. When the first fails, or if it never attaches, the second begins and proceeds subject to its own conditions and limitations." *Id.* (citing *Smith v. Union Insurance Co.,* 25 R.I. 260, 266, 55 A. 715, 717 (1903)). *See H.F. Shepherdson Co. v. Central Fire Insurance Co.,* 220 Minn. 401, 19 N.W.2d 772 (1945) (arson by mortgagor cannot invalidate mortgagee's coverage under standard mortgage clause); *Magoun v. Fireman's Fund Insurance Co.,* 86 Minn. 486, 91 N.W. 5 (1902) (standard mortgage clause is an independent contract of insurance not invalidated by act, neglect, omission or default of mortgagor).

---

1. "The standard mortgage will specify in some form of language that the insurance with respect to the mortgagee shall not be invalidated by the mortgagor's acts or neglect. The words 'any acts' as used in a standard mortgage clause do not refer merely to acts prohibited by the contract or to failure to comply with the terms thereof, but literally embrace any act of the mortgagor." 11 G. Couch, *Couch on Insurance* 2d § 42:685, at 344–345 (1963 & Supp. 1976).

■ The Minnesota cases which have examined this question all considered a standard mortgage clause under fire insurance policies. *See* Minn.Stat. § 65A.01, subd. 3 (1980) (Minnesota Standard Fire Insurance Policy includes standard mortgage clause which specifies that "no act or default" by any person other than mortgagee shall defeat coverage). However, no distinction appears to be made between fire insurance and chattel policies by the treatise writers, case law, or the parties; hence, the same principles apply to insurance coverage on an airplane. Under the previous analysis, it is very clear that the clause at issue is a standard mortgage clause, constituting an independent contract of insurance which cannot be invalidated by acts or neglect of the mortgagor, Young.

Avemco further argues that a Breach of Warranty Endorsement is a hybrid between a standard insurance clause and an open form mortgage clause.[2] This claim appears to be based upon the language of the endorsement which provides that "nothing contained therein shall vary the terms of the underlying policy."

We reject such a construction. We construe this language to mean that the issuance of a separate insurance policy to the mortgagee protecting it from the wrongful acts or neglect of the mortgagor, shall not vary the respective legal opposition of the insured and insurer under the terms of the policy.

■ 3. Having concluded that there are two separate and independent insurance policies involved, we must construe the rights of the mortgagee under its policy of insurance as they may be affected by the actions of the insured Young. The trial court found, and we agree, that the actions of Young constituted drug trafficking within the language of the exclusion portion of the policy. Consequently, the insured Young has no coverage under his policy.

However, under the bank's separate policy, the actions of Young were the very thing for which the bank's insurance was purchased—to protect it against loss caused by a violation of the terms of the policy by the mortgagor. The policy of the bank precluded coverage if there were a conversion, embezzlement, or secretion by Young of the airplane. These conditions did not occur. Thus we conclude that the actions of Young, involving drug trafficking and the seizure by the Colombian government, did not preclude recovery by American under its policy of insurance. This is a majority view. *Piedmont Fire Insurance Co. v. Fidelity Mortgage Co.*, 250 Ala. 609, 35 So.2d 352 (1948); *Underwriters at Lloyds, London v. United Bank Alaska*, 636 P.2d 615 (Alaska 1981); *Southwestern Funding Corp. v. Motors Insurance Corp.*, 59 Cal.2d 91, 378 P.2d 361, 28 Cal.Rptr. 161 (1963); *Foster v. United States Aviation Underwriters, Inc.*, 241 A.2d 914 (D.C.1968); *Security Insurance Co. of Hartford v. Commercial Credit Equipment Corp.*, 399 So.2d 31 (Fla.Dist.Ct. App.), *pet. for rev. denied*, 411 So.2d 384 (1981); *Americas Aviation & Marine Insurance Co. v. Beverly Bank*, 229 So.2d 314 (Fla.Dist.Ct.App.1969); *Employers' Fire Insurance Co. v. Pennsylvania Millers Mutual Insurance Co.*, 116 Ga.App. 433, 157 S.E.2d 807 (1967); *Bennett Motor Co. v. Lyon*, 14 Utah 2d 161, 380 P.2d 69 (1963); *Don Chapman Motor Sales, Inc. v. National Savings Insurance Co.*, 626 S.W.2d 592 (Tex.Civ.App. 1981).

Avemco cites *Avemco Insurance Co. v. Jefferson Bank & Trust Co.*, 613 S.W.2d 436 (Mo.App.1980), in support of its position. In *Jefferson*, an airplane was flown to Mexico where it crashed. Subsequently, its wreckage was seized by the Mexican government where it was further damaged. The insurer paid for the damages caused by the crash, but refused to pay the mortgagee for the damages caused by the governmental seizure. The seizure, it contended, was

**2.** This case could have been decided under the universal principle that ambiguities found in an insurance contract are resolved against the insurer in favor of coverage. *Caledonia Community Hospital v. St. Paul Fire and Marine Insurance Co.*, 307 Minn. 352, 239 N.W.2d 768 (1976); *Northwest Airlines, Inc. v. Globe Ind. Co.*, 303 Minn. 16, 225 N.W.2d 831 (1975). However, under the facts as presented we need not reach this question.

not caused by any act or neglect of the mortgagor and fell within a policy exclusion.

We find that case to be factually distinguishable. In addition, we would not adopt the finding of the Missouri court, since we would consider such damages to be readily foreseeable and causally related to the initial crash.

4. A more difficult question is posed by Avemco's challenge to the fact that the territorial limitations of the policy were violated. Article VIII of the insurance agreement, previously quoted, establishes time and territorial limitations. This occurrence fell within the time limits, but outside the territorial limitations of the policy. Again, as in the exclusion section of the policy, such a violation invalidated the insurance coverage between Avemco and Young.

However, the issue before us is whether this invalidates the separate insurance agreement of the bank. As previously stated, a separate policy of insurance was purchased by the bank to prevent losses caused by the acts of the mortgagor. This is what occurred. Avemco argues that to allow recovery is to widen the scope of the coverage afforded by the contract between the parties. We disagree. Such an argument would be applicable to the insurance agreement between Young and Avemco. However, the insurance agreement between the bank and Avemco must be interpreted to effectuate its purposes.

■ The terms and conditions of American's contract are identical to those of Young. However, when Young's act or neglect caused the violation of the territorial provisions in his policy, that identical provision in American's policy necessarily became inapplicable. The territorial provision applies to American only when it is guilty of breaching it. This conclusion is supported by the treatise writers and case law.

A distinction which is rather important to grasp is that the policy terms are themselves not nullified by a standard mortgage clause. It is, rather, that a new contract containing those provisions is made with the mortgagee personally; *and the mortgagee is not bound by the mortgagor's contract which, while it may be identical in language, may be breached by the mortgagor's act. In other words, the indemnity of the mortgagee is not placed at the whim of the debtor, and is subject only to breaches of which the mortgagee is, himself, guilty.*

5 A.J. Appleman, *Insurance Law and Practice* § 3401, at 292 (1970 & Supp.1981) (emphasis supplied).

The California case of *Southwestern Funding Corp. v. Motors Insurance Corp.,* 59 Cal.2d 91, 378 P.2d 361, 28 Cal.Rptr. 161 (1963), involved an automobile which was damaged in a collision in Mexico. The insurance policy covering the car had a territorial limitation which excluded Mexico. The contract included a standard mortgage clause protecting the mortgagee. The mortgagee sought recovery under its policy of insurance claiming that the mortgagor's act or neglect of taking the automobile to Mexico could not defeat its coverage. The California court agreed with the mortgagee in finding coverage. 59 Cal.2d at 95–96, 378 P.2d at 362, 28 Cal.Rptr. at 163.

Further support is found in *Couch on Insurance:*

While all clauses of an insurance contract should be construed together, and the provisions of a mortgage clause must be read together and harmonized with the balance of the policy when reasonably possible, the mortgage clause must prevail in the case of an irreconcilable conflict between it and other provisions of the policy. That is, insofar as the provisions of the policy are inconsistent with and antagonistic to the clause protecting the interest of the mortgagee, they must be regarded as inapplicable in determining his rights.

11 G. Couch, *Couch on Insurance* § 42:686, at 345 (1963 & Supp.1976).

Additionally, Robert Keeton in his insurance treatise states:

However [a coverage clause] defense [which is a perfect defense against the insured] may not be valid against a lien-

holder who is independently an insured under a "loss payable" clause of the standard mortgage type.

R. Keeton, *Insurance Law* § 6.5(e)(2), at 403 n. 7 (1971).

Finally, a case which is illustrative of the principle that a third party cannot defeat the insured's coverage under his policy of insurance is the analogous case of *Sunny South Aircraft Service v. American Fire and Casualty Co.*, 140 So.2d 78 (Fla.App. 1962), *aff'd sub nom. American Fire and Casualty Co. v. Sunny South Aircraft Service*, 151 So.2d 276 (Fla.1963). *Sunny South* involved an aircraft which was hijacked to Cuba. Upon its return to the United States it was overtaken by Cuban military aircraft which damaged the airplane by gunfire. The applicable insurance policy covered all loss caused by theft. However, it had a territorial restriction which excluded losses outside the United States. The insurer argued that even though the theft occurred in Florida, the loss occurred in Cuba, therefore the territorial exclusion barred recovery. The Florida court rejected this argument, holding that when an airplane is insured against theft and it "is subsequently damaged under circumstances which, but for the theft, would fall within an exclusionary provision, the loss represented by such damage is recoverable under the provision against theft, and the exclusionary clause is inapplicable." 140 So.2d at 80.

■ A similar argument could be made that the act or neglect of the mortgagor in not paying premiums would cause the policy to lapse, effectively denying the mortgage coverage. However, the contrary is true. The failure to pay the premium may result in loss of coverage to the insured, but doesn't necessarily invalidate coverage to the mortgagee under the standard insurance clause. That clause provides that in case the owner shall neglect to pay any premiums due under this policy the lienholder shall on demand pay the same. Thus, as part of the consideration for the issuance of the separate policy of insurance to the mortgagee the insurance company has exacted the right to collect the premium on its other policy with the mortgagee in the event the insured fails or neglects to pay the premium. This contractual right would preclude invalidation of the policy absent some notice by Avemco to the bank of its intent to invalidate the policy against it based on its failure to pay the premium on the policy of insurance existing between Avemco and the insured. Similarly, affirmative cancellation by a mortgagor absent notice to the mortgagee, does not invalidate a mortgagee's rights to coverage under a standard mortgage clause. *Employers' Fire Insurance Co. v. Pennsylvania Millers Mutual Insurance Co.*, 116 Ga.App. 433, 157 S.E.2d 807 (1967). *See* 60 A.L.R.3d 164, 168–69 (1974 & Supp.1982) (fire insurance-notice of expiration).

We conclude that coverage exists for American under the policy. Two separate contracts of insurance were issued by Avemco. Young by his acts or neglect breached the conditions and exclusion of his policy. He may not recover under his policy of insurance. However, his conduct cannot defeat American's right to coverage. It is only acts by American which violate the terms of its contract that could preclude coverage. Any other result destroys the concept of the standard mortgage clause and transforms it into an open mortgage provision. That result would be inconsistent with the language of the endorsement and case law. Since this is a standard mortgage clause and it is undisputed that American is not guilty of any breaches under its policy of insurance, it follows that the bank is entitled to recover from Avemco in accordance with the terms of the policy. We affirm the decision of the trial court in all respects.[3]

---

**3.** Avemco has raised other issues which we have considered and find to be without merit.