Craig MATTICE, Jr., Respondent,

Homecomings Financial Network,
Inc., Respondent,

v.

MINNESOTA PROPERTY
INSURANCE PLACEMENT, Relator,

Department of Commerce, Respondent.

No. C8–02–854.

Court of Appeals of Minnesota.

Dec. 24, 2002.

Craig Mattice, Jr., Plymouth, MN, pro se respondent.

Harold A. Frederick, Fryberger, Buchanan, Smith Frederick, P.A., Duluth, MN; and Mary K. Powers, Director and Associate Counsel, GMAC–RFC, Minneapolis, MN, for respondent HomeComings Financial.

Bradley J. Ayers, Wendy M. Canaday, Flynn, Gaskins Bennett, L.L.P., Minneapolis, MN, for relator.

Mike Hatch, Attorney General, Jennifer S. Kenney, Assistant Attorney General, St. Paul, MN, for respondent Department of Commerce.

Considered and decided by SCHUMACHER, Presiding Judge, RANDALL, Judge, and HUDSON, Judge.

## OPINION

ROBERT H. SCHUMACHER, Judge.

Relator Minnesota Property Insurance Placement, an insurance provider, challenges an order of the Commissioner of Commerce that it honor a damages claim filed by respondent HomeComings Financial Network, Inc. for losses sustained in a fire involving property insured by Minnesota Property and mortgaged to Home-Comings. Minnesota Property argues that because the fire insurance policy naming HomeComings as mortgagee was fraudulently obtained without the named insured's knowledge, it was void as to all named parties, including HomeComings. We affirm.

## FACTS

In January 1999, Howard Gangestad purchased a residential property in Minneapolis for $25,000. Seven months later, respondent Craig Mattice purchased the property from Gangestad with a $54,000 mortgage from HomeComings and $6,000 cash.

Immediately after closing, Mattice signed a quitclaim deed transferring the property back to Gangestad. In exchange, Gangestad paid Mattice $6,000 cash and assumed the mortgage payments, which he guaranteed by making Mattice a beneficiary of his life insurance policy. Although Gangestad became the property's titleholder after the quitclaim transaction, he intentionally failed to record the deed in order to circumvent a mortgage provision authorizing HomeComings to call the entire mortgage due in case of a sale. Mattice's name remained on the title and on the mortgage, but he had no further financial involvement with the property. The transaction enabled Gangestad to use Mattice's credit to get a loan, in the form of a mortgage, from HomeComings.

In September 2000, Gangestad instructed his insurance agent to submit to Minnesota Property an application for insurance coverage for the property. Minnesota Property is an organization of insurers charged by statute with implementing the Minnesota Fair Plan Act, pursuant to which all Minnesota insurers share responsibility for insuring high-risk property. *See* Minn.Stat. § 65A.31–.42 (2002). Minnesota Property is administered by a board of directors authorized to take appeals from Minnesota Property's coverage decisions. The board's determinations can in turn be appealed to the Commissioner of Commerce. Minn.Stat. § 65A.39.

The insurance agent completed the application in Mattice's name and named Mattice as the owner of the property and HomeComings as mortgagee. The agent forged Mattice's signature to falsely certify Mattice's insurable interest in the property and the truth of the information contained in the application. There is no evidence in

the record that Mattice had any knowledge of the application.

In September 2000, Minnesota Property issued a one-year $60,000 policy on the property naming Mattice as the insured and HomeComings as the mortgagee. The policy contained a standard mortgage clause providing that denial of a claim to the policy's insured "will not apply to a valid claim of the [policy's named] mortgagee."

In October 2000, the property was destroyed by arson. Mattice filed a property-damage claim with Minnesota Property and submitted a sworn statement in proof of loss indicating that he was the "fee owner" of the property. Minnesota Property denied Mattice's claim after its investigation revealed that the insurance application and policy were fraudulently obtained. Minnesota Property rescinded the policy and refunded the premiums. HomeComings filed a claim under the policy's standard mortgage clause. Minnesota Property denied HomeComings's claim, again reasoning that because the policy had been fraudulently obtained, it was null and void as to all covered parties, including mortgagee HomeComings.

Both Mattice and HomeComings appealed Minnesota Property's denial of their claims to its board of directors, which upheld the denials. The parties then appealed to the Commissioner, who consolidated the appeals and issued findings of fact, conclusions of law, and an order in April, 2002.

The Commissioner reversed Minnesota Property's decision to rescind the policy as to both Mattice and HomeComings. The Commissioner found that there was a fraudulent misrepresentation in the policy application: the statement that Mattice had an insurable interest in the property. The Commissioner nonetheless concluded that Minnesota Property could not rescind the policy as to either Mattice or Home-Comings because the policy's fraud provision and Minn.Stat. § 60A.08, subd. 9 (2002) authorize recission only if the misrepresentation is committed by or on behalf of the insured, and here, Mattice had no knowledge of the application.

The Commissioner affirmed the denial of Mattice's claim on the grounds that Mattice had intentionally defrauded Minnesota Property by claiming on the sworn statement in proof of loss filed after the fire to be the property's "fee owner." The Commissioner reversed Minnesota Property's denial of HomeComings' claim, reasoning that (1) the policy was not void under its own fraud provision or Minn. Stat. § 60A.08, subd. 9, because Mattice himself committed no fraud in the application, and (2) the Minnesota Standard Fire Insurance Policy, Minn.Stat. § 65A.01, subd. 3(c) (2002), precludes rescinding or voiding a policy as to a mortgagee because of a third party's fraud committed "before or during the term of [the] policy." The Commissioner remanded the case to Minnesota Property to determine and pay HomeComings's claim.

## ISSUES

1. Was the fraudulently obtained insurance policy void as to HomeComings?

2. Was HomeComings's recovery barred by its acquiescence in the policy's fraudulent procurement?

## ANALYSIS

We may reverse a decision by the Commissioner of Commerce if the decision violates the constitution, exceeds the agency's statutory authority or jurisdiction, is based on an erroneous theory of law, is not supported by substantial evidence, or is arbitrary and capricious.

Minn.Stat. § 14.69(a), (b), (e), (f) (2002); *Markwardt v. State, Water Resources Bd.,* 254 N.W.2d 371, 374 (Minn.1977). Although we defer to the Commissioner's findings of fact if they are reasonably supported by the evidence in the record, *Ress v. Abbott N.W. Hosp., Inc.,* 448 N.W.2d 519, 523 (Minn.1989), the interpretation of statutes and their application to undisputed facts present questions of law that we review de novo. *Brookfield Trade Ctr., Inc., v. County of Ramsey,* 584 N.W.2d 390, 393 (Minn.1998). We note that "judicial deference * * * is extended to an agency decision-maker in the interpretation of statutes that the agency is charged with administering and enforcing." *In re Excess Surplus Status of Blue Cross and Blue Shield of Minnesota,* 624 N.W.2d 264, 278 (Minn.2001) (citations and quotations omitted).

■ The party seeking review on appeal has the burden of proving that the agency decision meets one or more of the above-listed statutory criteria. *Markwardt,* 254 N.W.2d at 374. Minnesota Property contends the Commissioner's decision was based upon an erroneous theory of law and not supported by substantial evidence.

1. Minnesota Property argues the insurance contract between itself and respondent HomeComings was void ab initio because it was fraudulently obtained by Howard Gangestad's insurance agent. HomeComings argues the policy's standard mortgage clause gives it a separate and enforceable insurance contract with Minnesota Property that is unaffected by the agent's fraud.

■ A standard mortgage clause specifies that the insurance with respect to the mortgagee shall not be invalidated by the insured mortgagor's intentional acts or neglect. *American Nat. Bank and Trust Co. v. Young,* 329 N.W.2d 805, 810 n. 1 (Minn.1983). It is undisputed that the policy here contains a standard mortgage clause providing that "[i]f a mortgagee is named in this policy," denial of a claim made by the named insured "will not apply to a valid claim of the mortgagee * * *." The effect of a standard mortgage clause

> is to make a new and separate contract between the mortgagee and the insurance company, and to effect a separate insurance of the interest of the mortgagee, dependent for its validity solely upon the course of action of the insurance company and the mortgagee, and unaffected by any act or neglect of the mortgagor, of which the mortgagee is ignorant, whether such act or neglect was done or permitted prior or subsequent to the issue of the mortgage clause.

*Id.* at 810 (quoting *Allen v. St. Paul Fire and Marine Ins. Co.,* 167 Minn. 146, 150, 208 N.W. 816, 818 (1926) (citation omitted) (emphasis omitted)). The contract between the mortgagee and the insurer "begins and proceeds" when the contract between the insured and the insurer "fails, *or if it never attaches.*" *Allen,* 167 Minn. at 150, 208 N.W. at 818 (quotation omitted) (emphasis added). *See H.F. Shepherdson Co. v. Cent. Fire Ins. Co.,* 220 Minn. 401, 19 N.W.2d 772 (1945) (holding that arson by mortgagor cannot invalidate mortgagee's coverage under standard mortgage clause).

■ In Minnesota, both the inclusion and the terms of a standard mortgage clause in a fire insurance policy are mandated by statute. *See* Minn.Stat. § 65A.01, subd. 1 (2002) (the Minnesota Standard Fire Insurance Policy). When, as is the case here, an insurance policy's standard mortgage is inconsistent with the statutory policy provision, the statutory provision is substituted for the policy provision. *Watson v. United Servs. Auto. Ass'n,* 566 N.W.2d 683, 689 (Minn.1997).

The statute requires that fire insurance policies provide:

Notwithstanding any other provisions of this policy, if this policy shall be made payable to a mortgagee * * * of the covered real estate, no act or default of any person other than such mortgagee * * *, whether the same occurs before or during the term of this policy, shall render this policy void as to such mortgagee * * *.

Minn.Stat. § 65A.01, subd. 3 (2002). We note that the statute provides the innocent mortgagee coverage regardless of the wrongdoer's identity, and not, as was previously the case, only in case of an act or default of the mortgagor. *See American National,* 329 N.W.2d at 810 (holding that contract between "the insurance company and the mortgagee [is] unaffected by any act or neglect *of the mortgagor* " (emphasis added) (quotation omitted)).

Minnesota Property contends that the standard mortgage clause has no effect here because the fraudulent application precluded the policy from ever becoming a valid contract, and the policy was therefore void as to all named parties. The question of whether Minn.Stat. § 65A.01, subd. 3, provides a mortgagee coverage when the insurance contract was obtained through the fraud of a third party, and without the mortgagor's knowledge, is an issue of first impression in Minnesota.

 The object of statutory interpretation is to ascertain and effectuate legislative intent. *See* Minn.Stat. § 645.16 (2002). Generally, if statutory language is plain and unambiguous, we look to its plain meaning to determine the legislation's purpose. *Wegener v. Comm'r of Revenue,* 505 N.W.2d 612, 617 (Minn.1993). The Minnesota Standard Fire Insurance Policy plainly provides that

· no act or default of any person other than such mortgagee * * *, whether the

same occurs before or during the term of this policy, shall render this policy void as to such mortgagee * * *.

Minn.Stat. § 65A.01, subd. 3. The statute makes no exceptions for fraudulent applications or third party acts or defaults. Here, the policy was obtained through the fraud of a person other than HomeComings before the term of the policy, and is therefore not void as to HomeComings. Had the legislature intended to bar mortgagee recovery under the facts before us, it presumably would have drafted the statute accordingly. But as the statute is written, HomeComings is entitled to recover.

 Minnesota Property urges us to look beyond the plain meaning of the statute to general principles of contract law, which, Minnesota Property argues, compel the conclusion that the policy was void as to all named parties because there was no meeting of the minds between Mattice and Minnesota Property on the essential terms of the agreement. We note that the validity or existence of the contract between Mattice and Minnesota Property has no bearing on the validity of the separate contract between HomeComings and Minnesota Property, which "begins and proceeds" when the contract between the insured and the insurer "fails, or if it never attaches." *Allen,* 167 Minn. at 150, 208 N.W. at 818. We also note that our role is simply to interpret the statutory language, not to look beyond the statute's plain meaning in order to

in effect rewrite a statute so as to accomplish a result which might be desirable and at the same time conflict with the expressed will of the legislature.

*McNeice v. City of Minneapolis,* 250 Minn. 142, 147, 84 N.W.2d 232, 237 (1957); *see also State ex rel. Coduti v. Hauser,* 219 Minn. 297, 301–03, 17 N.W.2d 504, 507–08

(1945) (stating both that legislature may ignore logic and perpetrate injustice as long as it does not violate constitution and that, absent ambiguity, any remedy for suspect statute must be by amendment and not construction).

■ Minnesota Property also argues that the fraudulent application violated the policy's Concealment and Fraud provision as well as Minn.Stat. § 60A.08, subd. 9 (2002), both of which authorize voiding or rescinding an insurance policy when the insured party makes a material misrepresentation related to the insurance. Because we have concluded that Minn.Stat. § 65A.01, subd. 3, authorizes HomeComings to recover despite the fraudulent application, we need not address this argument. We note, however, that the record contains no evidence that Mattice, the insured party, participated in submitting the fraudulent application to Minnesota Property or had any knowledge of the policy's various misrepresentations. Therefore, neither the Concealment and Fraud provision of the policy nor Minn.Stat. § 60A.08, subd. 9, would bar coverage or authorize voiding or rescinding the policy for fraud.

2. Minnesota Property argues that HomeComings cannot recover under the insurance policy because it knew and acquiesced in the fraudulent quitclaim transaction between Gangestad and Mattice, thereby breaching its duty to inform Minnesota Property about the fraud. We disagree.

■ There is no evidence in the record that the quitclaim transaction between Gangestad and Mattice was fraudulent or otherwise illegal; Mattice, the titleholder, quitclaimed the property to Gangestad, as was his right. Nor is there evidence that HomeComings was aware of the quitclaim transaction, which Gangestad intentionally failed to record precisely to prevent Home-Comings from learning about the transfer.

The record contains no evidence that HomeComings had any knowledge of the Gangestad–Mattice quitclaim transaction.

## DECISION

We affirm the Commissioner's order concluding that Minn.Stat. § 65A.01 (2002) permits HomeComings to recover under the policy issued by Minnesota Property to Mattice.

**Affirmed.**

RANDALL, Judge (dissenting).

I respectfully dissent.

This is a single-issue case. The majority rests its decision on the "innocent mortgagee" protection feature of Minn.Stat. § 65A.01, subd. 3 (2002). The majority sets out the statute correctly and cites to the line of cases indicating that innocent (noncomplicit) third-party lenders cannot have their security interests, meaning their rights under a standard mortgage clause in a standard fire insurance policy, invalidated by any act or default of any person (other than, of course, that mortgagee), even when the act or default by the mortgagor/insured bars him from any recovery.

The classic case is arson by the policyholder, meaning the insured that has an insurable interest in the property. The arsonist is barred from any recovery under his fire insurance policy, but the third-party lender/mortgagee is entitled to collect from the fire insurance company. This is Minnesota's longstanding view, and is so in virtually all other states. But this case, on these facts, does not come under Minn.Stat. § 65A.01, subd. 3 and the cases interpreting that provision. Here is why. First, the majority concedes that the facts in this case present an issue of first impression in Minnesota. The majority states:

The question of whether Minn.Stat. § 65A.01, subd. 3 provides a mortgagee coverage when the insurance contract was obtained through the fraud of a third party, and without the mortgagor's knowledge, is an issue of first impression in Minnesota.

Despite this, the majority then assumes that the fact situations in the prior cases upholding the right of innocent third-party lenders to collect controls here. However, as counsel for respondent HomeComings Financial Network, Inc. (HCFN), the third-party lender, conceded, *every single case he briefed and brought to our attention* involved a case where *the insured* under the fire insurance policy was the person procuring the coverage, and then "before, during, or after" obtaining coverage, some fraud or other act occurred barring the policyholder from recovering, but not barring the lender. You do not have that connection between the insured, Mattice, and the fire insurance company, Minnesota Property Insurance Placement (MP) in this case. You do not have *any* connection between Mattice and MP in this case.

The record facts are that Gangestad, a party who ultimately wanted to benefit from the fraud, worked with an insurance agent, Sorenson, and Sorenson forged Mattice's signature to both certify Mattice's insurable interest in the property and the truth of the information contained in the application for fire insurance coverage. The majority agrees, and states that the record "contains no evidence" that Mattice, the insured party, participated in submitting the fraudulent application to MP. The majority agrees that Mattice had (obviously, since he did not participate in the application) no knowledge of the various misrepresentations made in the application for insurance. With this unique fact situation firmly in place, basic common sense and contract law should prevail.

Mattice can have absolutely no recognizable interest in any fire insurance policy contract with MP because (a) he never applied for insurance with MP; (b) he had no knowledge (and no complicity) that anyone else also applied for fire insurance with MP in his name; and (c) his signature was forged on the application by a third party he had no connection with, no complicity, and absolutely no idea that any such application under his forged name was ever submitted.

Respondent, Minnesota Department of Commerce (Commerce) came to the right result in denying Mattice any fire insurance coverage for the loss, but for the wrong reason. It found that MP could properly deny Mattice's claim because of his fraudulent misrepresentations made *after the loss* when he did, in fact, submit a claim to MP after the fire for monetary loss. At this point in time, Mattice tried to take advantage of the fraud of Gangestad and Sorenson and, thus, was denied any right to recovery. But I submit that Commerce erred when it found that Mattice had an "insured interest" in the property through MP and that any concealment or fraud provision in the policy did not initially apply to bar coverage under the policy for Mattice, finding that "the fraud was not committed by or on Mattice's behalf." Of course, the fraud was not committed by or on Mattice's behalf! It is agreed that he had nothing to do with the forgery, had no knowledge of it, and it was always for Gangestad, not for him. The fact that Mattice did not commit the fraud does not support the quantum leap that, therefore, he "must have coverage" and could collect under the exception for his later fraudulent act. Before you even get to the issue of when and under what circumstances he can or cannot collect under a contract of a fire insurance policy, *there has to be a*

*policy contracted for by Mattice.* That hasn't happened yet. There never was any contract between Mattice and MP.

As stated above, Commerce did find against Mattice on other grounds, namely, his after-the-fact fraudulent application for fire insurance proceeds, when the property had been destroyed by fire. By finding inappropriately that Mattice had an insured interest in the property with MP and could have collected from MP except for his later participation in fraud, respondent Commerce erred. That error, finding that Mattice had an insured interest and valid fire insurance policy with MP covering the destroyed property, is the only basis on which HCFN can recover under any circumstances. The parties agree HCFN has no direct rights, no fire insurance policy themselves, with MP. Rather, all their rights against MP are derivative through Mattice. The commissioner found that MP could not deny HCFN's claim because they were the innocent third-party lender/mortgagee and cited Minn.Stat. § 65A.01, subd. 3(c) (2002), which protects an innocent lender from third-party fraud. The majority affirms the commissioner's decision to require MP to pay HCFN. The simple and isolated problem with the commissioner's and the respondent HCFN's analysis is that the statute and the cases, as mentioned above, all are premised "on their being a valid insurance policy in place." It is elementary insurance law that an insurance policy is a contract.

> Insurance policies are similar to other contracts; they are matters of agreement by the parties and the function of a court is to determine what the agreement was and enforce it.

*Fillmore v. Iowa Nat. Mut. Ins. Co.,* 344 N.W.2d 875, 877 (Minn.App.1984). The basic elements of a contract have to be present to have a contract. The basic elements of a contract are offer, acceptance, and consideration. *S O Designs USA, Inc. v. Rollerblade, Inc.,* 620 N.W.2d 48, 53 (Minn.App.2002), *review denied* (Minn. Feb. 21, 2001). As well, to be valid, the parties must have a meeting of the minds regarding essential contract elements. *Minneapolis Cablesystems v. City of Minneapolis,* 299 N.W.2d 121, 122 (Minn.1980).

I can find no contract de jure, de facto, express or implied, between Mattice and MP. As stated above, the application for the policy happened in a total void as to Mattice. His signature was forged, and the majority agrees that the forgery was totally without his knowledge and/or complicity. Giving Mattice any contractual rights with MP violates decades of elementary contract law. To have a contract you need the basics, offer, acceptance, a matter capable of being contracted for, consideration, mutual assent, and a meeting of the minds. Mattice and MP *did not have one single element of a contract, let alone all of them between them.* Mattice and MP are like two strangers, living 10,000 miles apart on two different continents, who have never met, much less negotiated a binding contract between themselves. Assume that on one of those two continents, two swindlers, totally unknown to Mattice, forged his signature on a contract with another party. What possible rights does Mattice get out of this forgery!? What possible rights do the two swindlers, a continent away, confer on Mattice as against the person, here MP, being swindled? Now, respondents, the commissioner, and the majority concede that HCFN's rights do not appear out of thin air. HCFN's rights can only be derivative of Mattice, meaning his "insured interest" in the property destroyed by fire and his "interest" in the fire insurance policy running between MP and "Mattice." The commissioner could only find "rights" in HCFN by finding that Mattice had an

insured interest in the contract, and that although the insured interest was lost to Mattice (by his after-the-fact participation in the fraud), that "insured interest" of Mattice's was not lost to HCFN.

To me, you cannot just manufacture a "contract." You cannot create a "fire insurance contract" out of thin air and then willy-nilly use it to confer rights on various entities. To me, when you look at the origin of this "fire insurance contract," *there was never any such contract.* Put another way, an indispensable party to any contract between Mattice and MP is Mattice. As to the alleged fire insurance contract at issue, Mattice never existed.

This set of facts is what sets this case apart from all the older cases interpreting claims by lenders/mortgages under Minnesota's standard clause and Minn.Stat. § 65A.01, subd. 3(c) (2002). If any nod is given to elementary contract law, there is no contract in any way, shape, or form in this case for anyone, innocent or not, to claim an insured interest and vested contract rights through Mattice. It is true that HCFN was swindled by Gangestad and Sorenson. It is equally true that MP was swindled by Gangestad and Sorenson. Between the two, where does the loss fall? I suggest it has to fall on HCFN, not because they are not innocent, but because no loss can fall on MP, a company that sells fire insurance policies, which are fire insurance contracts, unless there is a "fire insurance contract."

The end result is simple. HCFN has a perfectly good cause of action against Gangestad and/or Sorenson, and can sue those parties and any other parties that they can show contributed to their loss. What HCFN wants to do is collect from MP and assign to MP the burden of chasing around the pool of defendants for monetary reimbursement. I submit that they cannot collect from MP and assign the burden to sue the individuals responsible for the fraud to MP. They have to shoulder that burden themselves. When you have total strangers to a "contract" in which all the contractual documents were forged, chasing down the forgers for indemnification for their loss properly falls here on HCFN because they dealt with Gangestad and Mattice.[1] MP never did.

The best analogy and the best precedent out there is Minnesota's longstanding homestead rule. There can be no valid sale of a homestead, nor can any mortgage validly attach to a homestead unless the document contains the signature of both husband and wife. As to homesteads, the Minnesota Supreme Court stated that void contracts cannot vest rights in the parties. A contract for the sale of a homestead lacking one of the required signatures *"must be held void for all purposes* and not constitute the basis of any action against the obligor." *Marr v. Bradley,* 239 Minn. 503, 507, 59 N.W.2d 331, 334 (1953) (emphasis added). This has long been the rule. *See Barton v. Drake,* 21 Minn. 299, 305 (1875) (stating " * * * the contract and decree being alike void, the defendant acquired by them no title to, or estate in, or lien upon, such homestead").

It is simple. You have two prongs when analyzing a purported sale of a homestead or the claims of a purported mortgagee. The first prong is to find out if both the husband and the wife signed. If they did not, *you do not move to the second prong* and analyze such questions as to "whether the consideration was adequate" or

---

1. The opening paragraph from the facts set out by the majority: "In January 1999, Howard Gangestad purchased a residential property in Minneapolis for $25,000. Seven months later, respondent Craig Mattice purchased the property from Gangestad with a $54,000 mortgage from HomeComings and $6,000 cash."

"whether the purchase was a bona fide purchaser for value." That second prong is irrelevant if you don't have the first. In this case, Commerce blithely assumed that there was a valid fire insurance contract in place, the first prong, and then went on to discuss under what circumstances Mattice could or could not recover under the policy and finally, under what circumstances HCFN could or could not recover. Commerce carefully spent a considerable amount of time analyzing the whys and the wherefores, and ultimately concluded that Mattice could not recover under the contract, but that HCFN could. The problem is, they had no reason to go on to the second prong, meaning recovery for whom, and for how much. They never analyzed the first prong, was there even a valid fire insurance contract in place. They "assumed" it and moved on. If a husband or a wife attempts on their own to sell the homestead, and some duped buyer "buys" it and actually pays some or all of the money to one spouse, the duped buyer may well have a common-law cause of action for theft by swindle against that spouse. But that cause of action does not affect the other spouse, and does not attach to the homestead. Here, the purported swindlers are Gangestad and Sorenson, the duped buyer is HCFN, and the homestead, meaning the money, the source of value, is the proceeds from MP's fire insurance policy. HCFN does not get to "the homestead," the fire insurance policy, but, rather, is left to its cause of action directly against the party or parties who defrauded them.

On our facts, there never was a first prong. There never was any valid fire insurance policy/contract in existence between Mattice and MP. HCFN conceded at oral argument that all of the cases they cited as precedent contained a real insured with a real insurable interest in the property who "before, during, or after" the formation of the policy contract, committed some type of fraud. Clearly, those sets of facts leave the innocent lender, pursuant to the above cited statutes and caselaw, free to proceed against the fire insurance policy for enough proceeds to cover the outstanding mortgage. But that is not this case.

I disagree with HCFN's argument that ruling against them and for MP will upset decades of established Minnesota law and will "chill" the interests of lenders to lend money to people to buy homes and businesses. That will not happen. It is stipulated this is a case of first impression. Lenders always have the innocent lender protection of the standard mortgage clause and the controlling statute when, as has happened every single time in the past, the fraud and/or arson was committed by the insured who had an insurable interest and negotiated a fire insurance policy with evil thoughts dancing in his head either before, during, or after the acquisition of the fire insurance policy. HCFN, and all lenders subsequent to this case, can protect themselves from this unique set of facts by asking the "insured" (in this case Mattice) one question. "Do you have a fire insurance policy in place on this property on which you wish to borrow money from us, using the property as collateral?" The insured will have to answer "yes" or "no." If the insured answers, "yes," the lender simply gets verification and then the benefit of the standard mortgage clause. If Mattice had been an actual insured here that participated in the fraud to obtain the policy, and then you had the fire, HCFN would have had the full protection of the standard mortgage clause. On the other hand, if Mattice had answered, "no, I don't," the lender simply says, "well, you will have to get fire insurance in place before we can make the loan." If HCFN had said to Mattice, "well, there is a fire

insurance application/policy in place from MP," Mattice is going to say, "I don't know anything about that. I never applied for any fire insurance." If shown the application with his signature, Mattice would say he never signed the application and someone else must have written in his signature. We know that is what he will say because we know from the record that he had no idea about the fraud/forgery committed to get the fire insurance policy. So when Mattice answers that he does not know about any such policy, and never signed any such application, the lender, here HCFN, is put on full notice of a red flag that they will logically investigate to protect themselves by making sure the insured has a valid fire insurance policy before committing to the loan.

In sum, by reversing in favor of MP, I see no harm whatsoever to the ability of mortgage lenders to protect themselves by valid assignments, meaning the standard mortgage clause in the standard fire insurance policy. On the other hand, by requiring MP to pay policy proceeds to HCFN, I see a total breakdown, and denial, of the essentials of elementary contract law when HCFN is allowed to recover using so-called derivative rights through Mattice's "insured interest in the property" and Mattice's "fire insurance policy/contract."

I respectfully dissent, and would reverse Commerce's decision and enter judgment for MP.