## NORTHWEST AIRLINES, INC. v. GLOBE INDEMNITY COMPANY.

225 N. W. 2d 831.

January 24, 1975—No. 44904.

*Harding A. Orren, M. Arnold Lyons, John C. Hart,* and *Robins, Davis & Lyons,* for appellant.

*Dorsey, Marquart, Windhorst, West & Halladay, William J. Hempel,* and *Lane Ayres,* for respondent.

YETKA, JUSTICE.

Plaintiff brought an action in the District Court of Hennepin County, seeking recovery under an insurance policy issued it by defendant for losses sustained as the result of criminal acts of an unknown person perpetrated in the states of Washington and Oregon during an airline flight. From the judgment of the district court determining that plaintiff was entitled to recovery, defendant appeals. We affirm.

On September 29, 1965, defendant (insurer) and plaintiff (insured) executed an insurance agreement entitled "Blanket Crime Policy" and providing indemnity for covered losses not to exceed $250,000, with a $20,000 deductible clause. This policy was in effect at the time of the alleged loss.

On November 24, 1971, plaintiff, in the normal course of its air carrier business, was operating Flight 305, originating at Minneapolis, Minnesota, terminating at Seattle, Washington, with intermediate stops, including Portland, Oregon.

A male passenger, ticketed under the name of D. B. Cooper, boarded Flight 305 at Portland, Oregon, carrying a briefcase. Cooper took a seat in the tourist section at the rear of the passenger cabin. At or near the time of takeoff, at approximately 3 p. m., he proceeded to "hijack" Flight 305 by threatening to detonate what appeared to be a bomb concealed in his briefcase unless the following demands were met:

(1) $200,000 in cash, to be delivered to the plane at Seattle.
(2) Four parachutes, to be delivered with the money.
(3) No police interference.
(4) Refueling of the plane at Seattle.

The above demands were communicated to the pilot, Captain William A. Scott, who, in turn, radioed plaintiff's headquarters at Minneapolis-St. Paul, and advised the company officials of Cooper's demands. As a result of discussions with other crew members Captain Scott decided to cooperate with the hijacker.

Plaintiff's Seattle ground personnel were notified of the hijacking and, further, received home office authorization to procure the money and parachutes demanded by Cooper. In order to obtain the $200,000 in cash, arrangements were made with Seattle First National Bank, through its airport branch. The money was taken from the vault of the bank's downtown facility, and transported to the airport by bank personnel and the Seattle police. The release of cash funds after normal banking hours resulted in a debit to plaintiff's account which was repaid by a transfer credit on the next banking day.

Mr. William C. Grinnell, an officer of Seattle First National Bank, arrived at the Seattle airport at approximately 5 p. m. with the money. He first proceeded to the airport branch of the bank to pick up the branch manager, who then accompanied Mr. Grinnell to plaintiff's air freight terminal, a "premises" of plaintiff insured within the meaning of the subject insurance policy. An authorized official of plaintiff gave a receipt for the $200,000 while it was *inside the terminal*. Mr. Grinnell transferred possession of the $200,000 to Captain Elwood M. Lee, a Northwest

official designated to transport the money to the hijacked airplane, which had landed at the Seattle airport and was parked at the end of a runway. Captain Lee proceeded to the airplane in an automobile and delivered the money to Stewardess Tina Larson, who carried the money into the airplane and surrendered direct physical custody of it to the hijacker. Upon receipt thereof, Cooper allowed the passengers to leave the airplane. Stewardess Larson also delivered the parachutes and other items to Cooper, who was still in the rear cabin of the aircraft. At that time, he allowed two other stewardesses to leave the airplane. Cooper, Stewardess Larson, and the cockpit crew of three men remained on board.

Pursuant to Cooper's instructions, the airplane took off for the stated destination of Mexico. However, intermediate fuel stops were negotiated with Cooper, the first of which was to be Reno, Nevada. The hijacker instructed the crew as to altitude, speed, and other details of the flight. After takeoff, Cooper ordered the remaining crew members to stay in the forward area of the aircraft and to keep the curtains to the tourist section closed. Shortly after takeoff, approximately 7:30 p. m., Cooper lowered the rear stairs of the airplane. Approximately halfway between Seattle and Portland, the instruments of the aircraft indicated that Cooper had jumped from these stairs. Upon landing in Reno, Nevada, the crew discovered that Cooper, the bomb, the money, and two parachutes were not on board. Neither Cooper nor the money has ever been located.

The "Blanket Crime Policy" underlying this appeal provides coverage as set forth in five insuring agreements, which may be described in general terms as follows:

(1) Employee dishonesty coverage.
(2) Loss inside the premises coverage.
(3) Loss outside the premises coverage.
(4) Money orders and counterfeit paper currency coverage.
(5) Depositor's forgery coverage.

Plaintiff seeks recovery under the following insuring agreements, which state in relevant part:

"LOSS INSIDE THE PREMISES COVERAGE

"II. Loss of Money and Securities by the actual destruction, disappearance or *wrongful abstraction* thereof *within the Premises* or within any Banking Premises or similar recognized places of safe deposit.

\* \* \* \* \*

"LOSS OUTSIDE THE PREMISES COVERAGE

"III. Loss of Money and Securities by the actual destruction, disappearance or *wrongful abstraction* thereof outside the Premises while being conveyed by a *Messenger* or any armored motor vehicle company, or while within the living quarters in the home of any Messenger.

"Loss of other property by Robbery or attempt thereat outside the Premises while being conveyed by a *Messenger* or any armored motor vehicle company, or by theft while within the living quarters in the home of any Messenger." (Italics supplied.)

Section 3 of the conditions and limitations of the policy provides the following definitions of terms relevant to the issues presented in this appeal:

" 'Money' means currency, coins, bank notes, Federal Reserve notes, precious metals of all kinds and bullion; and travelers checks, register checks and money orders held for sale to the public.

\* \* \* \* \*

" 'Employee' means any natural person (except a director or trustee of the Insured, if a corporation, who is not also an officer or employee thereof in some other capacity) while in the regular service of the Insured in the ordinary course of the Insured's business during the Policy Period and whom the Insured Compensates by salary, wages or commissions and has the right to govern and direct in the performance of such service, but does not mean any broker, factor, commission merchant, consignee,

contractor or other agent or representative of the same general character. * * *

* * * * *

" 'Premises' means the interior of that portion of any building which is occupied by the Insured in conducting its business.

* * * * *

" 'Messenger' means the Insured or a partner of the Insured or any Employee who is duly authorized by the Insured to have the care and custody of the insured property outside the Premises."

The trial court determined that there was a wrongful abstraction of money from within plaintiff's premises or from within plaintiff's bank premises, and also outside the premises while the money was being conveyed by a messenger as defined in the policy. From judgment for plaintiff in the amount of $180,000 plus interest and costs and disbursements, defendant appeals.

To recover, defendant correctly states that plaintiff must establish:

(1) That it suffered a loss of money.

(2) That the loss resulted from the actual wrongful abstraction thereof.

(3) That the wrongful abstraction is a risk covered in the policy.

Defendant attacks the first element on grounds that the trial court's finding that plaintiff "suffered a loss of $200,000 in money by means of wrongful abstraction thereof within the meaning of the contract of insurance" is too general. This assertion must fail because:

a) The court found that plaintiff obtained $200,000 in cash and delivered it to a stewardess who, in turn, delivered said money to the hijacker.

b) A fair reading of the findings establishes that the hijacker jumped from the airplane with the money.

c) The court found that none of the $200,000 has been recovered.

In the light of the foregoing, we cannot agree that the taking of the $200,000 is not a "loss of money" as defined in the policy.

Defendant maintains that the insuring agreement was intended to cover only specific money that plaintiff might have on its premises at any particular time from ticket sales and other receipts, and could not include borrowed money and that, therefore, the money taken really did not belong to Northwest Airlines. However, we see little reason for a distinction between money which plaintiff has on hand itself, which it borrowed, or which it could readily borrow.

The second requisite element, wrongful abstraction, is not defined in the policy and the parties agree that said term is unambiguous. The applicable rule of interpretation is found in Orren v. Phoenix Ins. Co. 288 Minn. 225, 228, 179 N. W. 2d 166, 169 (1970), which states:

"* * * Where the language used in an insurance contract is unambiguous, it must be given its ordinary and usual meaning the same as the language of any other contract, and this court cannot under the guise of construction redraft the contract."

Defendant characterizes the hijacking as extortion, which is "wrongful" according to the definition of extortion provided by defendant. Thus, the hijacking was wrongful. The term "abstract" is defined in Webster's New International Dictionary (2 ed. 1947) p. 10, as "to take secretly or dishonestly." [1] In light of the above-quoted rule from the Orren case it would appear clear that airline hijacking for ransom is indeed wrongful abstraction.

Defendant argues also that extortion is not a peril insured against by the policy. Defendant proposes that the rule of "expressio unius est exclusio alteris" is applicable because the inclusion of coverage for wrongful abstraction thereby excludes

---

[1] Plaintiff has cited a number of cases which have defined "wrongful abstraction." A review of these cases discloses that they are accurately cited as authority for the proposition advanced.

coverage for extortion and hijacking losses. We do not agree with these contentions.

Defendant contends that wrongful abstraction cannot occur when the taking is consented to by the owner, citing in support of this contention Farmers & Merchants State Bank v. National Surety Co. 163 Minn. 257, 203 N. W. 969 (1925). We reject this argument also. To say that, in the circumstances of this case, plaintiff in any way consented to its $200,000 loss is contra to logic as well as to law.

In summary, it is fair to state that the term "wrongful abstraction" is as broad in scope as it is possible to envision. Had defendant desired to couch coverage in more restrictive terms, it was its duty to do so since it is obvious that plaintiff would not voluntarily suggest more restrictive language which would naturally work to its detriment.

Defendant contends the third requisite element for coverage under Insuring Agreement II, wrongful abstraction within the premises, has not been fulfilled. It argues that the wrongful abstraction took place when Cooper assumed control of the airplane. Thus, it concludes that, since the $200,000 was not at the covered premises *at that moment,* there was no loss of money due to wrongful abstraction. This argument, too, must fail in the cold light of the fact that the hijacking consisted of a continuing course of related events beginning with the takeover of the airplane and culminating with the hijacker's successful escape with the money which was, *when taken,* owned by plaintiff.

During cross-examination both of plaintiff's officers in charge of insurance testified that they believed Insuring Agreement II provided coverage because they considered the airplane was a "premises" under this provision. When confronted with the definition of "premises" set forth in the policy, both witnesses admitted they were mistaken (as "premises" clearly does not include airplanes). Defendant thus argues that the "misconstruction and misinterpretation" by plaintiff's executives should not be the basis of finding that coverage existed under the policy.

However, the decision of the trial court was not reached on the erroneous interpretation that the airplane was the "premises."

In continuation of the above argument, defendant concludes that since the wrongful taking did not occur until the hijacker first exercised dominion over the money (i. e., when the money was delivered to him aboard the airplane) the wrongful taking did not occur within "premises" as defined in the policy. The authority cited in support of this theory is Saks v. St. Paul Mercury Ind. Co. 308 Mich. 719, 724, 14 N. W. 2d 547, 549 (1944), which held that "the crime of robbery is consummated only when the victim is deprived of dominion over his money or property."

However, the Saks case deals with robbery. Plaintiff has cited two recent extortion cases which are more closely analogous to the facts and insurance policy now at issue. The first of these cases is The University Nat. Bank of Fort Collins v. Insurance Co. of North America, No. C-3603 Civil, June 5, 1972 (unreported memorandum decision by Chief Judge Alfred A. Arraj, D. Colo.), which involved a successful extortion scheme directed against a bank president who was led to believe that his wife and daughter were in the custody of a kidnapper. Pursuant to the demands of the extortionist, the bank president took a large sum of money from the bank and delivered it to a designated "drop site" outside the bank premises from which the money was thereafter taken, presumably by the extortionist. The insurance policy in that case provided the following coverage:

"Loss of Property (occurring with or without negligence or violence) through robbery, burglary, common-law or statutory larceny, theft, false pretenses, hold-up, misplacement, mysterious unexplainable disappearance, damage thereto or destruction thereof * * * while the Property is (or is supposed to be) lodged or deposited within any offices or *premises* located anywhere * * *." (Italics supplied.) Unreported memorandum decision, p. 2.

The insurer denied coverage, alleging the loss took place at

the drop site and thus did not occur within the premises. The court rejected this argument by stating:

"* * * We find this argument unpersuasive, because under the agreed facts *the thief had effectively asserted control over the funds as of the time that Farnham* [the bank president] *decided to comply with the instructions. * * *

"* * * Rather, it seems obvious to us that once having determined the threat was viable and compliance called for, Farnham became an unwilling agent of the thief in effectuating the actual removal. Consequently, we find that the loss occurred at the moment Farnham took possession of the money with the purpose of depriving the bank of it." (Italics supplied.) Unreported memorandum decision, p. 3.

The court distinguished Saks v. St. Paul Mercury Ind. Co. *supra,* and Cartier Drug Co. v. Maryland Cas. Co. 181 Wash. 146, 42 P. 2d 37 (1935), relied upon by defendant in the case at bar, on the ground that both cases involved personal confrontations between the thief and victim. The court found insignificant that the threat was communicated from a distance, concluding that the loss had occurred within the "premises."

The second and more recent extortion case cited by plaintiff is Bank of Dade v. Fidelity & Deposit Co. of Maryland, 483 F. 2d 735 (5 Cir. 1973), which is virtually identical to the Fort Collins case. The Dade court approved of the rationale of the Fort Collins case in reaching a similar holding.

It is apparent that much of the argument in the instant litigation was addressed to the meaning of the allegedly "clear" language of the policy at issue.

When that policy is read as a whole, we find it to be in the nature of a blanket or all-risk policy, as opposed to one which covers only specified risks. As defendant's counsel admitted in oral argument, mere unforeseeability of the manner in which the loss was sustained will not *per se* constitute grounds for the insurer to deny coverage. In the present case, where there is blanket cov-

erage and the risk at issue was not excluded, the insurer must fulfill its contractual obligation to indemnify the insured.

Moreover, as noted above, both parties have strongly argued that there is no ambiguity present in the policy at issue. However, the very fact that their respective positions as to what this policy says are so contrary compels one to conclude that the agreement is indeed ambiguous. The rule is well settled that ambiguous language will be strictly construed in favor of the insured.[2] Taulelle v. Allstate Ins. Co. 296 Minn. 247, 207 N. W. 2d 736 (1973); Orren v. Phoenix Ins. Co. 288 Minn. 225, 179 N. W. 2d 166 (1970).

Affirmed.

---

[2] Defendant contends that the rule of strict construction should not be applied against it because the policy at issue was the result of arm's-length negotiations between defendant and a sophisticated insured which was represented by its own insurance experts. However, the record shows that the basis for the policy at issue was a printed form supplied by defendant. The specific provisions at issue were taken verbatim therefrom.