**ST. PAUL FIRE AND MARINE INSURANCE COMPANY and St. Paul Mercury Insurance Company, Plaintiffs,**

v.

**METPATH, INC., Maryland Medical Laboratory, Inc., and Corning Clinical Laboratories, Inc., as the Successor of Maryland Medical Laboratory, Inc., Defendants.**

No. Civ. 3–96–703 RHK/JMM.

United States District Court,
D. Minnesota.

Jan. 26, 1998.

As Amended Feb.4, 1999.

Thomas Kane, Rikke Dierssen–Morice, & Bethany Culp, Oppenheimer, Wolff & Donnelly, St. Paul, Minnesota, for plaintiffs.

Thomas Mielenhausen, Smith, Parker, Minneapolis, Minnesota, and William Passannante & John Gasior, Anderson, Kill, & Olick, New York, New York, for Defendants.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

Plaintiffs St. Paul Fire and Marine Insurance Company and St. Paul Mercury Insurance Company (collectively "St. Paul") issued professional liability insurance to Defendant MetPath, Inc.[1] ("MetPath") for the policy period April 1, 1994 to April 1, 1995. During this period, MetPath acquired Defendant Maryland Medical Laboratory, Inc. ("MML") and added MML to its professional liability insurance policy, effective June 8, 1994. Shortly after it was added to the policy, MML informed St. Paul of three claims being brought against it and MetPath involving MML's failure to diagnose cancer in blood tests it had performed. St. Paul filed the instant action, seeking a declaration that it was not required to defend or indemnify the Defendants for these three claims. Presently before the Court are the parties'

Cross–Motions for Summary Judgment. For the reasons set forth below, the Court will grant the Defendants' Motion, and it will grant the Plaintiffs' Motion in part and deny it in part.

### Facts

MetPath, which is headquartered in Teterboro, New Jersey, is engaged in the clinical laboratory medical testing business. (Calamari Aff. ¶ 3.) MetPath operates over 1000 testing laboratories around the country. (Dierssen–Morice Aff. in Opp'n to Defs.' Mot. for Summ.J. [hereinafter "D–M Opp'n Aff."] Ex. 9 (Aug. 10, 1994 letter from Joseph Peiser to Daniel Fosterling).) St. Paul sold MetPath a series of "Medical Professional Liability Protection—Claims Made"[2] insurance policies which provided coverage from April 1, 1989 to April 1, 1995. (Gasior Aff.Ex. 2 at Resp. 8 (Pls.' Resps. to Defs.' Reqs. for Admis.).) The final policy in this series was policy number 0566xm1452 (the "Policy"), with a policy period of April 1, 1994 to April 1, 1995. (*Id.* at Resp. 7). MetPath had as many as 74 separate companies insured under the Policy. (D–M Opp'n Aff.Ex. 1 (Policy Change Endorsement listing the named insureds under the Policy).)

### 1. *The Policy*

The medical professional liability protection which St. Paul provided to MetPath under the Policy included two layers of coverage. The "Medical Professional Liability Protection Claims–Made Excess of Self Insured–Retention" insuring agreement provided the first, primary layer of coverage. This provided $1,000,000 total in coverage for covered claims or suits brought during the policy period, and it was subject to a $1,000,000 each person,

---

**1.** During much of the period relevant to the instant action, MetPath was called Corning Clinical Labs. The company has changed names several times, and it is now called *Quest Diagnostics.* For purposes of these Motions, the Court will refer to MetPath and Corning Clinical Laboratories collectively as "MetPath."

**2.** An insurance policy is "claims made" if it covers any claim brought against the insured during that time period, regardless of when the conduct forming the claim occurred.

self-insured retention, and a total, self-insured retention of $3,000,000.[3] (Gasior Aff.Ex. 1 at SP/MET PLUF 1824 (the Policy).) The second layer of coverage was provided by the "Health Care Facility Umbrella Excess Liability Protection" coverage, which was subject to a $5,000,000 per person limit and a $15,000,000 total limit of liability. (*Id.* at SP/MET PLUF 1805.)

The Policy contained an exclusion for "known prior acts [hereinafter "Known Prior Acts Exclusion"]:"

> **Known prior acts.** We won't cover claims or suits:
>
> —made or brought against a protected person;[4]
>
> —that a protected person know[s] about; or
>
> —that a protected person could have foreseen or discovered in a reasonable way;
>
> prior to the effective date of this agreement. And if this agreement is a renewal, the effective date is that of the earliest preceding agreement from which we have continuously provided the protection provided by this agreement.

(*Id.* at SP/MET PLUF 1830.) The Policy defined a claim as "a demand which seeks damages or your report of an injury or death that you feel will likely result in a demand which seeks damages." (*Id.* at SP/MET PLUF 1825.)

St. Paul also issued MetPath a Commercial General Liability Policy ("CGL Policy"), effective for the policy period April 1, 1994 through April 1, 1995.[5] (Dierssen–Morice Aff. in Supp. of Pls.' Mot. for Summ.J. [hereinafter "D–M Supp.Aff."] Ex. 17 (the CGL Policy).) The CGL Policy provided commercial general liability protection on an "occurrence" basis. It stated:

> **Bodily injury and property damage liability.** We'll pay amounts any protected person is legally required to pay as damages for covered bodily injury,[6] property damages, premises damage or patient's property damage that:
>
> —happens while this agreement is in effect; and
>
> —is caused by an event.

(*Id.* at SP/MET POL 720–21.)

The CGL Policy contained the following "health care professional services" exclusion:

> **Health care professional services.** We won't cover injury or damage or medical expenses that result from the performance of or the failure to perform health care professional services.
>
> **Health care professional services** include:
>
> —dental, medical, mental, nursing, surgical, x-ray and other health care professional services, including food or beverages provided with those services; . . . .

(D–M Supp.Aff.Ex. 17 at SP/MET POL 730.)

### 2. *MetPath Acquires MML*

In 1993 and 1994, MetPath aspired to become the preeminent laboratory testing and health sciences company in the world. In order to achieve this goal, it became an "acquisitive company," aggressively acquiring laboratories around the United

---

**3.** A self-insured retention "is the amount [the insured will] be responsible for before the limits of coverage [in the Policy] will apply." (Gasior Aff.Ex. 1 at SP/MET PLUF 1828 (the Policy).)

**4.** A "protected person" is "any person or organization qualifying as a protected person under the Who is Protected Under This Agreement section." (Gasior Aff.Ex. 1 at SP/MET PLUF 1825.) Organizations listed on the "Named Insured/Retroactive Date Endorse-ment" are protected persons. (*Id.* at SP/MET PLUF 1824.)

**5.** MML was added as a named insured under the CGL Policy on January 11, 1995. (D–M Supp.Aff.Ex. 17 at SP/MET POL 554.)

**6.** "Bodily injury" is defined as "any physical harm, including sickness or disease, to the physical health of other person." (D–M Supp.Aff.Ex. 17 at SP/MET POL 721.)

States and abroad. (D–M Supp.Aff.Ex. 10 (handwritten notes dated July 27, 1994) & Ex. 11 (Aug. 10, 1994 letter from Joseph Peiser to Daniel Fosterling).) On June 8, 1994, MetPath purchased MML, a medical testing laboratory in Baltimore, Maryland. (*Id.* Ex. 12 (July 13, 1994 letter from Louise Lemanski to Joseph Peiser).)

On June 8, 1994, St. Paul issued to MetPath a Policy Change Endorsement that "revised" the "Named Insured/Retro-active Date Endorsement" to "include Maryland Medical Laboratory, Inc., retroactive date 11–15–87." (D–M Opp'n Aff.Ex. 1 (Policy Change Endorsement).) The Policy Change Endorsement stated: "this endorsement summarizes the changes to your policy. All other terms of your policy not affected by these changes remain the same." (*Id.*) It further stated that the "Agreement takes effect 06–08–94." (*Id.*)

### 3. *The Claims Against MML*

Prior to MetPath's purchase of MML, MML was aware that it had failed to diagnose Donna Kneeland, Charles Campbell, and Nancy Perkins with cancer. (Mummert Dep. 65–66, 71; Khalluf Dep. 25; Passen Dep. 120.) MML was also aware that attorneys representing these individuals or their estates had contacted it, requesting reports and other documentation on the testing MML had performed.

In February 1994, MML, as part of the due diligence that MetPath performed in its purchase, provided MetPath with a list of pending and potential claims against it. (Copmann Dep. 253–58; D–M Supp. Aff.Ex. 15 (claims history chart).) On this list, MML identified the factual circumstances surrounding the misdiagnosis of specimens taken from Donna Kneeland as a "potential claim." (D–M Supp.Aff.Ex. 15.) On May 2, 1994, MML identified the facts of the Kneeland claim on its updated report. (*Id.*)

### 4. *St. Paul's Handling of the Kneeland, Campbell, and Perkins Claims*

On July 19, 1994, MetPath reported to St. Paul that Nancy Perkins had filed a claim in the Health Claims Arbitration Office in Baltimore, Maryland against MML. (D–M Supp.Aff.Ex. 51 (July 19, 1994 letter from Marie Ricci to Elizabeth Camp).) On September 28, 1994, MetPath reported the misdiagnosis of Campbell's slide as a "potential professional liability claim" against MML to St. Paul,[7] (*id.* at 39 (Sept. 28, 1994 letter from Diane Possumato to Elizabeth Camp)), and on October 15, 1994, it reported to St. Paul that the estate of Donna Kneeland had filed suit against MML. (*Id.* at Ex. 31 (Oct. 15, 1994 letter from Diane Possumato to Elizabeth Camp).)

On July 28, 1995, St. Paul issued a reservation of rights letter to MetPath, reserving its right to withdraw from the defense of the three claims [hereinafter "the underlying claims"] based upon evidence of MML's knowledge of these claims prior to June 8, 1994. (D–M Supp.Aff.Ex. 52 (July 28, 1995 letter from Jane Isenberg to David Meinhard).) On August 7, 1996, St. Paul withdrew from the defense of the underlying claims. (D–M Opp's Aff. Ex. 21 (letter from Laura Toregas to Anne Cote).)

### Analysis

### I. Standard of Review

Federal Rule of Civil Procedure 56 states:

> [Summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return

---

7. In early 1995, Campbell filed suit against Corning Clinical Laboratories, Inc. f/k/a/ Maryland Medical Laboratories, Inc. (Mielenhausen Aff.Ex. 11 (Campbell Complaint).)

a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In evaluating the movant's showing, the court should draw all justifiable inferences in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986); *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513; *see also Thomas v. Runyon*, 108 F.3d 957, 959 (8th Cir.1997). Where a moving party makes and supports a motion for summary judgment in accordance with Rule 56, a party opposing the motion may not rest upon the allegations or denials of its pleadings; rather, the adverse party's response must "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256, 106 S.Ct. at 2514. *See also* Fed.R.Civ.P. 56(e).

## II. Interpretation of the Known Prior Acts Exclusion

St. Paul claims that the Known Prior Acts Exclusion in the Policy precludes it from having any duty to defend or indemnify the Defendants in the underlying claims. The Defendants respond that the Known Prior Acts Exclusion does not apply to the underlying claims because MML did not know about them before April 1, 1989, the date when St. Paul first issued insurance to MetPath, and accordingly, St. Paul is required to defend and indemnify them on these claims.

**8.** Neither party asserts that there is a substantive difference between Minnesota insurance law and New Jersey insurance law. The Court, therefore, need not engage in a choice of law analysis to determine which forum's

## A. Applicable Law

■ Minnesota law on the interpretation of insurance contracts is well settled.[8] "The initial burden of demonstrating coverage rests with the insured; the burden of establishing the applicability of exclusions rests with the insurer." *Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 736 (Minn.1997). Exclusions are to be strictly interpreted against the insurer. *Bob Useldinger & Sons, Inc. v. Hangsleben*, 505 N.W.2d 323, 327 (Minn.1993).

■ Courts must construe insurance contracts as a whole and give unambiguous language its plain and ordinary meaning. *State Farm Ins. Cos. v. Seefeld*, 481 N.W.2d 62, 64 (Minn.1992). Undefined terms must be given their "plain, ordinary, and popular meaning." *Minnesota Mining & Mfg. v. Travelers Indem.*, 457 N.W.2d 175, 179 (Minn.1990). While a court has no right to read an ambiguity into the plain language of an insurance policy, ambiguity in the insurance contract must be construed in favor of the insured. *See id.* "When language of an insurance policy is ambiguous or susceptible of two meanings, it must be given the meaning which is favorable to the finding of insurance coverage." *Nordby v. Atlantic Mut. Ins. Co.*, 329 N.W.2d 820, 822 (Minn.1983).

■ St. Paul argues that these rules of construction for insurance contracts, commonly referred to as *contra proferentem*, should not apply to the Defendants because they are large, sophisticated companies who utilized an insurance broker in obtaining the Policy. (Pls.' Mem. at 19–21.) The Court disagrees. Neither the law of Minnesota nor the law of New Jersey supports this contention.

In *Pittston Co. Ultramar America v. Allianz Ins. Co.*, 124 F.3d 508 (3d Cir. 1997), the Third Circuit clarified the issue

law it should apply in the instant case and is free to apply either body of substantive law. *See Phillips v. Marist Soc'y*, 80 F.3d 274, 276 (8th Cir.1996); *Nesladek v. Ford Motor Company*, 46 F.3d 734, 736–37 (8th Cir.1995).

of when New Jersey courts would and would not apply typical rules of construction to an insurance contract. After discussing several New Jersey cases on the subject, the Third Circuit concluded that:

> Read in conjunction, these cases indicate that the dispositive question is not merely whether the insured is a sophisticated corporate entity, but rather whether the insurance contract is negotiated, jointly drafted or drafted by the insured. In such instances, we conclude that the doctrine of *contra proferentem* should not be invoked to inure to the benefit of the insured.

*Id.* at 521.

In the instant case, St. Paul has not pointed this Court to any evidence in the record indicating that MetPath negotiated or jointly drafted the Policy with St. Paul. Thus, the Court concludes that, under New Jersey law, the doctrine of *contra proferentem* is applicable to the instant case.

The parties have not cited, and the Court has not found,[9] any Minnesota case law dealing with the issue of whether the doctrine of *contra proferentem* should apply to large corporations. In *Northwest Airlines, Inc. v. Globe Indemnity Company*, 303 Minn. 16, 225 N.W.2d 831 (1975), the Minnesota Supreme Court, without any discussion of when the doctrine of *contra proferentem* is inapplicable, reject-

ed the defendant's argument that the doctrine should not be applied to the plaintiff who was a large corporation because the record indicated that the policy at issue was a "printed form supplied by defendant," and not the product of negotiations. *Id.*, 303 Minn. at 26 n. 2, 225 N.W.2d at 837 n. 2. In addition, Minnesota courts have applied the doctrine of *contra proferentem* when large corporations are involved, although these cases do not directly discuss the issue of whether the doctrine is applicable in such circumstances. *See, e.g. SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 315 (Minn.1995); *Caledonia Community Hosp. v. St. Paul Fire & Marine Ins. Co.*, 307 Minn. 352, 354, 239 N.W.2d 768, 770 (Minn.1976); *Kabanuk Diversified Inv., Inc. v. Credit Gen. Ins. Co.*, 553 N.W.2d 65, 70 (Minn.Ct.App.), *review denied*, Oct. 28, 1996. The Court concludes, therefore, that Minnesota courts would apply the doctrine of *contra proferentum* to the instant case.

## B. Application to the Known Prior Acts Exclusion

■ The Policy contains an exclusion for "known prior acts."

**Known prior acts.** We won't cover claims or suits:

—made or brought against a protected person;

---

9. The Plaintiffs cite *National City Bank v. St. Paul Fire & Marine Insurance Company*, 435 N.W.2d 57 (Minn.Ct.App.), *reversed on other grounds*, 447 N.W.2d 171 (Minn.1989), for the proposition that liberal rules of construction of insurance contracts cannot benefit the Defendants. In *National City Bank*, the Minnesota Court of Appeals analyzed the reasonable expectations doctrine. *Id.* at 63–64. Under this doctrine, Minnesota courts will interpret *unambiguous* language in an insurance policy in accordance with the insured's reasonable expectations, even though the plain language of the policy defeats such an interpretation. *Id.* The court in *National City Bank* held that the reasonable expectations doctrine did not apply because there were no hidden exclusions in the policy at issue and because the insured was a major national bank with bar-

gaining power equal to that of the insurer. *Id.*

The Court concludes that *National City Bank* is inapposite to the instant case. The reasonable expectations doctrine applies when an insurance policy is *unambiguous*, but the insured argues that it should be interpreted in a manner inconsistent with the policy's plain meaning. The Policy at issue does not contain *unambiguous language* which the Defendants contend should be interpreted in accordance with their reasonable expectations, and not in accordance with its clear meaning. Instead, the Court has determined that the Policy is *ambiguous*, and that under rules applying to the interpretation of insurance contracts, it must interpret the ambiguous language in the insured's favor.

—that a protected person know[s] about; or

—that a protected person could have foreseen or discovered in a reasonable way;

*prior to the effective date of this agreement. And if this agreement is a renewal, the effective date is that of the earliest preceding agreement from which we have continuously provided the protection provided by this agreement.*

(Gasior Aff.Ex. 1 at SP/MET PLUF 1830 (emphasis added).)

The parties dispute the meaning of "the effective date of this agreement." The Defendants contend that the term "this agreement" refers to the Policy itself, which is a renewal policy because St. Paul has "continuously provided the protection provided by [the Policy]" to MetPath since April 1, 1989. (Defs.' Mem. in Supp. of its Mot. for Summ.J. at 13.) ("Defs.' Supp. Mem.") Because it is a renewal policy, the Defendants argue that the exclusion provides that the "effective date" is "that of the earliest preceding agreement from which we have continuously provided the protection provided by [the Policy]," i.e. April 1, 1989. They could not have known about the three underlying claims before April 1, 1989, the defendants maintain, because the misdiagnoses had not yet occurred. (*Id.* at 13–17.)

St. Paul responds that the term "this agreement" refers to a separate insurance policy for MML, and that its "effective date" was the day it was added to the Policy, June 8, 1994. (Pls.' Mem. in Opp'n to Defs.' Mot. for Summ.J. at 11–12.) ("Pls.' Opp'n Mem."). It contends that the Policy Change Endorsement adding MML to the Policy states that "the Agreement takes effect June 8, 1994," thus clearly defining the "effective date" for "this Agreement" as June 8, 1994 (*Id.* at 12.) The Policy cannot be considered a renewal policy in relation to MML, St. Paul argues, because MML was added to the Policy on June 8, 1994, two months after it went into effect.[10] (*Id.* at 14.)

The Court finds that each side has advanced a reasonable interpretation of the Known Prior Acts Exclusion, and therefore, it is ambiguous. Neither the language in the exclusion itself nor in the Policy as a whole precludes either interpretation, and neither interpretation strains the plain meaning of the words in the exclusion. As St. Paul acknowledges, the Known Prior Acts Exclusion does not provide for or anticipate the instant situation—when a insured who has received continuous insurance protection from St. Paul adds another entity to that policy— and none of the relevant terms are defined in the Policy. (*See* McDonald Dep. 76–77; Toregas Dep. 191–92.)

Under St. Paul's definition, the Known Prior Acts exclusion has different "effective dates" for every new entity that was added to the Policy, and the term "this agreement" in the exclusion refers to the individual endorsements adding each of these entities to the Policy. Nothing in the language of either the Policy as a whole, the Policy Change Endorsement, or the Known Prior Acts exclusion, however, would lead an insured to believe that these terms have different meanings for each company on the Policy. The Known Prior Acts Exclusion speaks of "this Agreement," not "these Agreements." Moreover, the term "this Agreement" appears numerous times throughout the Policy, and there is no indication that it has multiple

---

10. MetPath is a named defendant in the Campbell lawsuit. All of St. Paul's arguments regarding why the Known Prior Acts Exclusion bars coverage for the underlying claims address only MML's knowledge of the underlying suits. Because MetPath is also a defendant in one of these claims, MetPath's knowledge is also relevant. Under the terms of the Known Prior Acts Exclusion, claims against MetPath are not covered if it knew about, or reasonably should have known about, the claims before April 1, 1989. MetPath could not have known about the Campbell claim before this date. The Court concludes, therefore, that the Policy provides coverage to MetPath for the Campbell lawsuit.

meanings, at times referring to the Policy itself and at other times referring to the Policy Change Endorsement.

St. Paul had a duty to define this term if it intended for them to have multiple meanings. *See Northwest Airlines, Inc. v. Globe Indem. Co.,* 303 Minn. 16, 225 N.W.2d 831, 835 (1975) (noting that insurer had a duty to make restrictive, narrow interpretation of a term clear). As the Minnesota Court of Appeals has noted, "[t]he insurer drafted this policy. It had the opportunity to clearly identify coverage and exclusions. It did not do so. Thus, it must bear the consequences." *Safeco Ins. Co. v. Lindberg,* 380 N.W.2d 219, 222 (Minn.Ct.App.), *aff'd,* 394 N.W.2d 146 (Minn.1986).

St. Paul advances several arguments as to why the Defendants' interpretation of the Know Prior Acts Exclusion is not reasonable, but the Court finds these arguments unpersuasive. First, St. Paul contends that the Policy cannot be considered a renewal[11] as to MML because MML was not a named insured before the Policy was issued in April 1994. (Pls.' Opp'n Mem. at 13.) To make this argument, however, St. Paul is reading language that does not exist into the Known Prior Acts Exclusion. The exclusion states: "And if this agreement is a renewal, the effective date is...." (Gasior Aff.Ex. 1 at SP/MET PLUF 1830.) It does not state: "And if this agreement is a renewal *for the protected person (or the named insured) seeking coverage,* the effective date is...." There is nothing in the language of the exclusion or the Policy which precludes "this agreement" from referring to the Policy itself. The Policy is clearly a renewal; St. Paul has provided continuous coverage to Met-Path since April 1, 1989.

■ St. Paul's main argument as to why the Defendants' purported interpretation is unreasonable is that it exposes St. Paul to risks that it did not intend in issuing the policy. This fact alone, however, does not make it unreasonable. St. Paul's position is that MML's "effective date" for purposes of the Prior Known Acts exclusion is the day it was added to the Policy. If St. Paul wanted this to be the case, it should have clearly worded the language of the Policy to say this.

Because the Known Prior Acts exclusion is ambiguous, the Court must give it the meaning that favors finding coverage.[12]

---

11. St. Paul contends that "the widely accepted definition of a 'renewal' insurance policy requires that a 'renewal' policy be 'based upon and subject to the same terms and conditions as were contained in the original policy.'" (Pls.' Mem. at 14 n. 9) (citing *Hartford Accident and Indem. Co. v. Sheffield,* 375 So.2d 598, 600 (Fla.Dist.Ct.App.1979); *Folstad v. Farmers Ins. Exchange,,* 297 Minn. 496, 210 N.W.2d 238 (1973); *Tully v. Liberty Mut. Fire Ins. Co.,* 516 So.2d 435, 439 (La. Ct.App.1987).) These cases all deal with the issue of whether, under a state law requiring automobile insurance to include uninsured motorist coverage, a policy could be considered a renewal policy, thus exempting it from uninsured motorist coverage under an exception in the applicable statutes. *See Sheffield,* 375 So.2d at 600; *Folstad,* 297 Minn. at 489–99, 210 N.W.2d at 240; *Tully,* 516 So.2d at 438–39. The courts deciding narrowly construed portions of statutes permitting the rejection of uninsured motorist coverage in renewal policies because of public policy considerations in favor of requiring such insurance. *See Sheffield,* 375 So.2d at

599 ("It is well settled in our jurisdiction and elsewhere that this provision must be construed so as to effectuate, if possible, the broad public policy in favor of providing uninsured motorist protection."); *Folstad,* 297 Minn. at 498, 210 N.W.2d at 240 (noting that it did not find policy a renewal because "to hold otherwise would frustrate the important policy considerations that prompted the legislature to restrict, and eventually abolish, the written-rejection exemption").

The Court finds that the definitions of "renewal" advanced in these opinions are inapposite to the instant case because the same public policy concerns are not present.

12. Even if the Court agreed with the Plaintiffs' interpretation of the Known Prior Acts exclusion and found that the exclusion barred all claims that MML knew about or should have known about before June 8, 1994, the Court would deny their Motion. The Court believes that genuine issues of material fact exist regarding what MML actually knew before June 8, 1994 about the underlying

*Nordby,* 329 N.W.2d at 822. The Court finds that the term "this Agreement" in the Known Prior Acts Exclusion refers to the Policy itself and that the "effective date of this agreement" is April 1, 1989. Accordingly, the exclusion bars claims or suits which MML and MetPath knew about, or reasonably should have known about, before April 1, 1989. Because none of the acts which form the basis of the underlying claims occurred before April 1, 1989, the Known Prior Acts Exclusion does not bar St. Paul from having a duty to defend and indemnify MML and MetPath in the three underlying actions. The Court, therefore, will grant the Defendants' Motion for Summary Judgment with respect to the existence of coverage under the Policy for the underlying claims.[13]

## III. The CGL Policy

St. Paul argues that the underlying claims are not covered by the CGL Policy because: (1) the exclusion for health care professional services bars such coverage; and (2) the policy is an occurrence policy and the malpractice alleged in the underlying claims did not occur when the policy was in effect. (Pls.' Supp.Mem. at 26–27.) MetPath responds that its "clinical laboratory medical testing business" is not covered under the health care professional services exclusion. (Defs.' Mem. in Opp'n to Pls.' Mot. for Summ.J. at 34–35.) ("Defs.' Opp'n Mem.")

The CGL Policy states:

> claims. The Defendants have presented evidence upon which a reasonable jury could conclude that MML could not have reasonably known about the underlying claims before June 8, 1994, even though they knew that they had made misdiagnoses in each case.

13. St. Paul argues that because "the 'known prior acts' exclusion clearly precludes coverage for MML for the underlying claims under [the Policy], the defendants' allegations of breach of good faith and fair dealing and breach of fiduciary duty resulting from St. Paul's withdrawal from the defense of those claims must fail." (Pls.' Revised Mem. in

**Bodily injury and property damage liability.** We'll pay amounts any protected person is legally required to pay as damages for covered bodily injury, property damages, premises damage or patients property damage that:

—happens while this agreement is in effect; and

—is caused by an event.

(*Id.* at SP/MET POL 720–21.)

The Court concludes that the CGL Policy does not provide coverage for the underlying claims because the Defendants have not shown that the bodily injuries which the plaintiffs alleged in the underlying claims occurred while the policy was in effect, from April 1, 1994 to April 1, 1995.[14] *See Domtar,* 563 N.W.2d at 736 (holding that burden of demonstrating coverage rests with the insured). Donna Kneeland died of cancer in September 1993. (D–M Supp.Aff.Ex. 20 (Defs.' Resp. to Req. for Admis.No.18).) Clearly she did not suffer any bodily injury during the policy period. MML misread Charles Campbell's slide on May 27, 1992 and failed to diagnose him with cancer on that date. (*Id.* at Ex. 33 (MML's May 27, 1997 report on Charles Campbell).) On March 30, 1993, MML misread Nancy Perkins' slide and failed to diagnose her with cancer on that date. (*Id.* at Ex. 42 (MML's March 30, 1993 report on Nancy Perkins).) These two errors occurred well before the period when the policy was in effect, and the Defendants have presented no evidence that the plaintiffs in the underlying claims suffered any covered bodily injury during

> Supp. of Their Mot. for Summ.J. at 28.) ("Pls.' Supp.Mem.") This is St. Paul's sole argument supporting the dismissal of these claims. Because the Court finds that coverage exists for the underlying claims under the Policy, the Court will deny St. Paul's Motion with respect to the Defendants' claims for breach of good faith and fair dealing and breach of fiduciary duty.

14. The Defendants made no response to the Plaintiffs' arguments on this issue. (*See* Defs.' Opp'n Mem. at 34–35.)

the period in which the CGL Policy was in effect. The Court, therefore, will grant the Plaintiffs' Motion with respect to the existence of coverage for the underlying claims from the CGL Policy.

### Conclusion

Accordingly, based on the foregoing, and upon all the files, records, and proceedings herein, **IT IS ORDERED** that:

1) Plaintiffs' Motion for Summary Judgment (Doc.No.108) is **GRANTED IN PART** with respect to Paragraph 51 of the First Amended Complaint; and the Court **DECLARES** that there is no coverage for the Defendants for the underlying litigation under the Commercial General Liability Policy issued by St. Paul Mercury;

2) Plaintiffs' Motion for Summary Judgment is **DENIED IN ALL OTHER RESPECTS**; and

3) Defendants' Motion for Summary Judgment (Doc.No.115) is **GRANTED IN PART** with respect to Paragraphs 88 & 93 of the Defendants'/Counter–Claimants/Third Party Plaintiffs' Answer, Affirmative Defenses, Counterclaim and Third–Party Complaint; and the Court **DECLARES** that the Plaintiffs are obligated under the Policy to pay for the Defendants' liability, if any, for the underlying claims, in accordance with the limits as to the amounts of coverage provided under the Policy, and that the Plaintiffs are obligated to the Defendants to defend and pay defense costs with respect to the underlying claims, in accordance with the terms and limits on the amount of coverage under the Policy.