**GENERAL MILLS, INC., a Delaware corporation, Respondent,**

v.

**GOLD MEDAL INSURANCE COMPANY, Appellant.**

No. C2–00–1428.

Court of Appeals of Minnesota.

Feb. 6, 2001.

Review Denied April 17, 2001.

Lawrence Zelle, Lawrence Hofmann, Zelle, Hofmann, Voebel & Gette, LLP, Minneapolis, MN, (for respondent).

Richard P. Mahoney, Victor E. Lund, Mahoney, Dougherty and Mahoney, Minneapolis, MN; and Stephen A. Cozen, Richard M. Mackowsky, Cozen and O'Connor, Philadelphia, PA, (for appellant).

Considered and decided by ANDERSON, Presiding Judge, KLAPHAKE, Judge, and HARTEN, Judge.

## OPINION

KLAPHAKE, Judge

Appellant challenges summary judgment entered against it, finding insurance coverage for losses suffered by respondent and denying appellant a setoff against other insurance. Because we conclude as a matter of law that there was direct physical loss to insured property as required by terms of the policy, and because the exclusions from coverage relied on by appellant are ambiguous, we affirm the decision of the district court. Because the district court did not err in its application of the law regarding setoffs, we affirm as to that issue as well.

## FACTS

Respondent General Mills, Inc. (General Mills), is a Delaware corporation with executive offices in Minnesota. Appellant

Gold Medal Insurance Co. (Gold Medal), a Minnesota corporation and wholly-owned subsidiary of General Mills, was established by General Mills as a captive insurer for the purpose of accessing insurance markets in a cost-effective manner. Because Gold Medal has no actual employees, American Risk Management (ARM), an independent company that specializes in such work, handles its essential services. ARM drafted the wording of the Gold Medal insurance contracts that were issued to General Mills, although General Mills had considerable bargaining power with respect to the terms of the various policies.

This matter involves two insurance policies. The first policy, a Named Peril/Grain Stocks policy (named-peril policy), provided coverage for General Mills' grain storage facilities at Duluth and Superior, as well as other storage facilities. The second, the All Risk Property Policy (all-risk policy) covered all real and personal property of General Mills at named locations, but did not include the Duluth and Superior storage facilities. The limit of coverage for the named-peril policy was $65,576,000, and for the all-risk policy was $3,276,890,000.

In 1993–94, General Mills hired George Roggy, an independent contractor, to treat its grain stocks in Duluth and Superior with an FDA-approved pesticide, Reldan. Unbeknownst to General Mills, Roggy substituted the cheaper, but unapproved, pesticide Dursban. Although Reldan and Dursban are chemically almost identical, and although Dursban was approved for treatment of other foods, Dursban was not approved for use on oats. The FDA treats the presence of an unapproved chemical as an illegal adulteration of food products, even if not dangerous for human consumption; the fact that Dursban was not approved for application on oats was sufficient to violate FDA regulations on adulteration of food products.

In a routine inspection, the FDA discovered traces of Dursban in oat stocks at one of General Mills' facilities and traced it to the Fridley plant.[1] Upon notification, General Mills immediately halted distribution and production of oat products, but some of the adulterated oat stocks had already been milled into oat flour and converted to finished product, and other adulterated oat stocks had been mixed with unadulterated stock. By the time the problem was uncovered, 16 million bushels of raw oats and the equivalent of 55 million boxes of Cheerios and other oat-based cereals had been affected. To remove all traces of Dursban, all machinery at the milling plants had to be disassembled, cleaned, and reassembled.

There is little dispute that Dursban presented no health hazard to the consuming public. However, General Mills voluntarily held the adulterated cereals, based on the understanding that the FDA would order it to do so if General Mills attempted to distribute the product. General Mills considered petitioning the FDA for a waiver that would permit distribution of the cereals, but concluded that the matter could not be resolved in a timely fashion. Even if the FDA eventually granted a waiver, General Mills product freshness deadlines could not have been met. Instead, General Mills discarded all adulterated products. General Mills was also faced with a public relations problem, as news of the pesticide adulteration became public. The parties stipulated that General Mills' losses, including destruction of oat stocks and finished products and cleaning costs, were $167,542,874, plus interest and costs.

General Mills sought coverage for its losses under the all-risk and named-peril policies purchased through Gold Medal, and under another policy, the National

Union Malicious Product Tampering Policy (National Union policy), purchased through a New York insurer. Coverage was denied under all three policies. A declaratory judgment action filed in New York over the National Union policy was eventually settled for $17.5 million, without an admission of coverage. General Mills also brought this breach of contract suit against Gold Medal for coverage under its two policies.

On a motion for summary judgment, the district court held that the losses were covered under the all-risk policy, but not covered under the named-peril policy. Further, the district court found no basis for a setoff against the National Union policy. Appellant Gold Medal appeals from the judgment finding coverage and denying a setoff.

## ISSUES

I. Did the district court err in concluding that General Mills had suffered a direct physical loss of insured property?

II. Did the district court err in concluding that General Mills' loss was not excluded from coverage under the policy exclusions?

III. Did the district court err in concluding that Gold Medal was not entitled to a setoff because of other insurance?

## ANALYSIS

"On an appeal from summary judgment, we must examine two questions, whether there are any genuine issues of material fact and whether the lower courts erred in their application of the law." *Cummings v. Koehnen*, 568 N.W.2d 418, 420 (Minn. 1997) (citation omitted). "A reviewing court must view evidence in the light most favorable to the party against whom summary judgment was granted." *Vetter v. Security Continental Ins. Co.*, 567 N.W.2d 516, 520 (Minn.1997) (citation omitted). Both parties agree that there are no genuine issues of material fact.

■ The construction of an insurance contract is a question of law determined de novo by the reviewing court. *Jenoff, Inc. v. New Hampshire Ins. Co.*, 558 N.W.2d 260, 262 (Minn.1997). As a question of law, interpretation of an insurance contract may be decided by the district court on a motion for summary judgment. *American Nat'l Fire Ins. Co. v. Cordie*, 478 N.W.2d 531, 533 (Minn.App.1991).

■ In construing an insurance contract, the intention of the parties is the overriding concern, to be determined by the language of the entire contract. *Bobich v. Oja*, 258 Minn. 287, 294, 104 N.W.2d 19, 24 (1960). Endorsements and exclusions must be construed in terms of the entire contract, and in such a way, if possible, to give effect to all provisions. *Id.* at 294–95, 104 N.W.2d at 24–25. Language is to be given its plain and ordinary meaning. *Id.* at 294, 104 N.W.2d at 24.

■ Where an insurance contract is ambiguous, the court applies the doctrine of *contra proferentem*, by which ambiguities in a document are to be construed unfavorably to the drafter or in favor of coverage. *Black's Law Dictionary* 328 (7th ed.1999). The court may not create an ambiguity where none exists. *Bobich*, 258 Minn. at 294, 104 N.W.2d at 24. Relatively equal bargaining power does not preclude application of the doctrine of *contra proferentem*. *St. Paul Fire & Marine Ins. Co. v. MetPath, Inc.*, 38 F.Supp.2d 1087, 1092 (D.Minn.1998); *see, e.g., SCSC Corp. v. Allied Mut. Ins. Co.* 536 N.W.2d 305, 315 (Minn.1995); *Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 180–81 (Minn.1990); *Northwest Airlines, Inc. v. Globe Indem. Co.*, 303 Minn. 16, 26, n. 2, 225 N.W.2d 831, 837 n. 2 (1975).

### I. Physical Damage to Property

■ The all-risk policy provides coverage against " 'All Risks' of direct physical loss or damage to property insured and described herein." There is no definition

of "direct physical loss or damage" included in the policy. Gold Medal argues that the district court erred in finding a direct physical loss, because Dursban did not render the oats and products unfit for human consumption; the loss occurred only because of government regulation, and not because of direct damage to the insured property.

■ In an "all-risk" policy, coverage usually extends to

> risks not usually covered under other insurance, and recovery under an "all-risk" policy will, as a rule, be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage.

13A George J. Couch, *Couch on Insurance* § 48:141 (2d ed.1982).

We have previously held that direct physical loss can exist without actual destruction of property or structural damage to property; it is sufficient to show that insured property is injured in some way. *Sentinel Mgmt. Co. v. New Hampshire Ins. Co.*, 563 N.W.2d 296, 300 (Minn.App. 1997). In *Sentinel,* we noted that the function of a residential apartment building, to provide safe housing, was seriously impaired or destroyed by the presence of asbestos fibers, although the building itself did not suffer a "tangible injury." *Id.* Likewise, the function of the food products produced by General Mills is not only to be sold, but to be sold with an assurance that they meet certain regulatory standards. When General Mills is unable to lawfully distribute its products because of FDA regulations, that function is seriously impaired.

We are not persuaded by Gold Medal's argument that the food products could be safely consumed but for a legal regulation that does not truly affect the function of the product. This matter is similar to the factual scenario in *Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co.*, 256 Minn. 404, 98 N.W.2d 280 (1959). Mar-

shall Produce was under contract with the United States Army to produce milk powder, egg powder, and raw eggs and had to meet certain very specific and rigorous standards. One of the standards was that the plant had to be "free from strong foul odors, dust, and smoke-laden air." *Id.* at 408, 98 N.W.2d at 284–85. The produce company was covered by a fire policy issued by St. Paul Fire & Marine. A fire at a neighboring property caused the plant to be filled with heavy smoke, although no fire occurred on the premises of Marshall Produce. *Id.* at 407, 98 N.W.2d at 284.

When apprised of the presence of smoke, the army rejected the goods, apparently with no attempt to ascertain whether there was actual damage to the product. *Id.* at 409–10, 98 N.W.2d at 285–86. Thus, the product was damaged not necessarily because it was hazardous, but because of army regulations that set forth stringent requirements for the manufacturing environment. The court noted that the impairment of value, not the physical damage, was the measure of damages. *Id.* at 423, 98 N.W.2d at 293.

Much like *Marshall Produce,* General Mills was unable to sell its products or use the contaminated oats, because of legal regulations. The business of manufacturing food products requires conforming to the appropriate FDA regulations. Whether or not the oats could be safely consumed, they legally could not be used in General Mills' business. The district court did not err in finding this to be an impairment of function and value sufficient to support a finding of physical damage.

## II. Exclusions from Coverage

### Contamination

■ Gold Medal argues that, even if there is direct physical loss, it is excluded from coverage by policy language that states:

PERILS EXCLUDED:

* *[T]his policy does not insure against loss or damage caused by or resulting from any of the following *regardless of*

*any other cause or event contributing concurrently or in any other sequence to the loss:*

 A. Delay, loss of market or any other indirect or consequential loss or damage not specifically covered herein, gradual deterioration or leakage, seepage, inherent vice, latent defect, moth, vermin, termites or other insects, ordinary wear and tear, *contamination,* dampness of atmosphere, wet or dry rot, mold, shrinkage, evaporation, loss of weight, rust, corrosion, change in flavor or color or texture or finish, *unless caused by or resulting from a peril not excluded hereunder.*

(Emphasis added.) Gold Medal asserts that the injury is one of contamination, clearly excluded by this language.

The district court concluded that this exclusion was unambiguous if read in the following manner: damage caused by a concurrent peril and an excluded peril (contamination) is not covered, except if the *peril,* not the damage, of the excluded peril (contamination) is caused by a peril not excluded. Because the actions of Roggy are a non-excluded peril that created the peril of contamination, the resulting injury would be covered.

Gold Medal, on the other hand, urges that the proper interpretation is that the exclusion and anti-concurrent clause apply, unless the peril of contamination is caused by a peril not excluded by the policy as a whole. Gold Medal argues that Roggy's actions are not covered by the policy, occurring as they did at a site specifically not covered by the policy.

■■■■■ A policy is ambiguous if it is reasonably subject to more than one interpretation. *American Commerce Ins. Brokers, Inc. v. Minnesota Mut. Fire & Cas. Co.,* 551 N.W.2d 224, 227 (Minn.1996). As one court noted:

[T]he very fact that their respective positions as to what this policy says are so

contrary compels one to conclude that the agreement is indeed ambiguous.

*Northwest Airlines, Inc.,* 303 Minn. at 26, 225 N.W.2d at 837. Here we have two opposing interpretations reasonably based on policy language, particularly in the absence of any definition of material terms. We conclude that this exclusion is open to more than one interpretation and thus is ambiguous. Therefore, although the district court did not find this clause to be ambiguous, we agree with its conclusion in favor of coverage.

■■■■■ When relying on an exclusion to coverage, the insurer bears the burden of proving the application of the exclusion. *SCSC Corp.,* 536 N.W.2d at 313–14. Exclusions are interpreted narrowly against the insurer. *Id.* at 314. Gold Medal has not sustained its burden of proving that its interpretation of the exclusion is the only reasonable one. Thus, this exclusion will not operate to deny coverage.

### Faulty Materials

■■■■■ Gold Medal also claims that the district court erred in deciding that the exclusion against faulty materials did not preclude coverage. This exclusion is as follows:

Unless endorsed hereon, this policy does not insure against loss or damage caused by or resulting from any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss:

 D. Errors in design, faulty workmanship or *faulty materials,* unless a loss from a peril not otherwise excluded ensues and then only for the loss or damage caused by the ensuing peril.

(Emphasis added.)

■■■■■ The court concluded that this exclusion, by its grouping with "design" and "faulty workmanship" refers to materials for construction of property, rather than to raw stock for making cereal products. This is a permissible interpretation; courts

often look at the greater context or purpose of a clause in order to determine its meaning. *Henning Nelson Const. Co. v. Fireman's Fund Am. Life Ins. Co.*, 361 N.W.2d 446, 450 (Minn.App.1985) (exclusion for earth movement applies only to natural disasters when included in provision with earthquakes, volcanic eruption, and landslide), *aff'd as modified*, 383 N.W.2d 645 (Minn.1986).

Gold Medal bears the burden of proving the applicability of this exclusion. *See SCSC*, 536 N.W.2d at 313–14. The district court did not clearly err in finding that this exclusion was not applicable.

### III. Other Insurance

Gold Medal appeals from the district court's ruling dismissing its setoff claim against the National Union policy. The referee and district court concluded that the National Union policy, a malicious product tampering policy, did not afford coverage under New York law,[2] because New York law requires actual malice. The district court found that Roggy's conduct constituted ordinary, not actual malice. Because this would not trigger coverage, no setoff was due to Gold Medal.[3]

Gold Medal's setoff claim is premised on the following clause from the all-risk policy:

This policy shall not cover to the extent of any other insurance whether prior or subsequent hereto in date, and by whomsoever effected, directly or indirectly covering the same property against the same perils and this Company shall be liable for loss or damage only for the excess value beyond the amount due from such other insurance, subject to the limits of this policy.

The National Union policy contains much the same language:

The insurance provided under this policy will be excess over any other coverage provided under any other valid bond or insurance applicable in whole or in part to any Loss under this policy.

 The primary issue, then, is whether there is coverage under the National Union policy, an issue that the district court answered in the negative. The operative language of the National Union policy states:

**MALICIOUS PRODUCT TAMPERING** is any actual, alleged or threatened, intentional, malicious, and wrongful alteration or contamination of the Insured's Product(s), whether or not by an employee of the Insured, so as to render it unfit or dangerous for use or consumption or to create such impression to the public.

Finding no New York decisions specifically dealing with malicious product tampering insurance, the court concluded that, based on New York property insurance cases, "malicious mischief" requires actual, not ordinary, malice. The district court here found that Roggy's actions were ordinarily malicious; thus, there was no coverage.

Actual malice, as opposed to ordinary malice, requires a subjective intent to injure the policyholder. *See Fanberg Realty Corp. v. Travelers Cos.*, 117 A.D.2d 582, 498 N.Y.S.2d 53 (N.Y.App.Div.1986); *Romanych v. Liverpool & London & Globe Ins. Co.*, 8 Misc.2d 269, 167 N.Y.S.2d 398 (N.Y.Sup.Ct.1957). The difference between actual and ordinary malice is well-defined in a case analyzing Minnesota law, which is similar to New York law:

Malice alone contemplates an intentional act undertaken with the knowledge that is wrongful, while actual malice adds the desire to injure another or, as discussed below, an affirmative disregard of the known harm accruing to others as a result of the intentional act.

*U.S. Fire Ins. Co. v. Beltmann North Am. Co., Inc.*, 883 F.2d 564, 566 (7th Cir.1989).

---

**2.** The parties agree that New York is the proper forum for interpretation of the National Union policy, under its choice of law clause.

**3.** General Mills did recover $17.5 million from National Union through a settlement agreement; there was no admission of coverage.

After taking testimony from Roggy, the district court concluded that he acted with ordinary malice. This conclusion is based on the fact that although he knew it was wrong to substitute Dursban, he assumed that the substitution would never be discovered and that no one would be harmed by his action. In the absence of a desire to injure the policyholder, General Mills, the court held that Roggy lacked the actual malice to trigger coverage under the National Union policy.

The policy language requires "intentional, malicious and wrongful" tampering in order to trigger coverage. This language goes beyond the mere commission of a wrongful act; it includes the concept of intending to harm, which is within the definition of actual malice. The district court did not err in concluding that there was no coverage and thus no setoff under the National union policy.

## DECISION

The district court did not err in finding a direct physical loss under the policy. The loss of the function of the insured property, General Mills's ability to sell products for consumption within the regulatory framework calculated to guarantee safe consumption, is sufficient to prove a direct physical loss under the policy language. Gold Medal has the burden of proving application of exclusions from coverage. Where an exclusion is ambiguous, Gold Medal has not sustained that burden; thus, the district court did not err in concluding that the exclusions from coverage for contamination and faulty materials were not applicable. In order to have a setoff against other insurance, Gold Medal must demonstrate coverage under the other policy, which it has failed to do. The district court's conclusion in this issue is not erroneous.

**Affirmed.**